UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X
                                    :

OUMAROU BOCOUM,                       :

                   Plaintiff,    :

                              :        17 Civ. 7636 (JPC) (BCM)

     -v-                     :

                              :        <u>OPINION AND ORDER</u>

DAIMLER TRUCKS NORTH AMERICA LLC    :
and TRW AUTOMOTIVE U.S. LLC,        :

                            :

                 Defendants.   :

                              :

------------------------------------------------------------------ X

JOHN P. CRONAN, United States District Judge:

      Plaintiff Oumarou Bocoum brings this products liability action to recover damages for

personal injuries sustained when the tractor-trailer that he was operating crashed and rolled over

while traveling eastbound on Factory Hollow Route 2 near Greenfield, Massachusetts.  Alleging

that defects in the tractor-trailer's steering gear caused the crash, Plaintiff asserts negligence and

strict liability claims for manufacturing defect, design defect, and warning defect, as well as breach

of warranty claims, against Defendants Daimler Trucks North America LLC ("DTNA"), which

designed and assembled the tractor-trailer, and ZF Active Safety and Electronics US LLC ("ZF

ASE")[1], which designed and manufactured the steering gear used by DTNA in the vehicle.

---

[1] On August 9, 2019, Defendant TRW Automotive U.S. LLC filed a notice of name change
advising the Court and all parties in this action that, "[e]ffective May 31, 2019, Defendant TRW
Automotive U.S. LLC changed its legal name to ZF Active Safety and Electronics US LLC."  Dkt.
42 at ¶ 1.  According to the notice, "[t]his name change does not impact any of the parties' claims
or defenses" and "ZF ASE maintains the same legal structure, operations, assets, liabilities, and
legal responsibilities as TRW Automotive U.S. LLC."  *Id.* ¶ 2.  The notice also included ZF ASE's
request that the Court and all parties update their files to reflect its new name.  *Id.* ¶ 3.  During a
conference held on August 16, 2019, the parties agreed to amend the caption "if or when [the
parties] get to a trial."  Dkt. 45 at 27-28.  Given the denial in part of summary judgment in this
Opinion and Order, and therefore the Court's intention to set a trial date in the near future, the
Clerk of Court is respectfully directed to amend the caption of this action to replace "TRW

Defendants have moved for summary judgment on all of Plaintiff's claims and the parties moved to exclude the testimony of their adversaries' proffered experts under Federal Rule of Evidence 702.  For the reasons discussed below, Defendants' motion for summary judgment is granted in part and denied in part.  Moreover, the Court (1) grants in part and denies in part Defendants' motion to exclude the proffered expert testimony of Frank Grate, (2) grants in part and denies in part Defendants' motion to exclude the proffered expert testimony of Robert McElroy, (3) denies Plaintiff's motion to exclude the proffered expert testimony of Nicholas Durisek, (4) grants in part and denies in part Plaintiff's motion to exclude the proffered expert testimony of Timothy Cheek, and (5) grants in part and denies in part Plaintiff's motion to exclude the proffered expert testimony of Bruce Noah.

---

Automotive U.S. LLC" with "ZF Active Safety and Electronics US LLC, *formerly known as* TRW Automotive U.S. LLC."  Given the name change, the Court refers to this Defendant as ZF ASE in this Opinion and Order.

# I.   Background

## A.   Facts[2]

### 1.   The Crash

At approximately 1:45 a.m. on September 4, 2015, Plaintiff was involved in a tractor-trailer crash while driving eastbound on Factory Hollow Route 2 in Massachusetts (the "Crash"). Pl. Counter 56.1 Stmt. ¶ 26; Dkt. 84-10 ("Tucker Dep. Tr.") at 27:20-28:2 (testimony of Massachusetts State Trooper Michael Tucker who responded to the Crash). At the time of the Crash, Plaintiff was driving a 2007 Freightliner Columbia CL120 heavy truck, which was designed and assembled by DTNA (the "Truck"). Pl. Counter 56.1 Stmt. ¶¶ 1-2. The Truck had a steering gear designed and manufactured by ZF ASE (the "Steering Gear"). *Id.* ¶ 3. The Truck was loaded with paper products and weighed more than 68,000 pounds. *Id.* ¶ 25. At the time of the Crash, Plaintiff was on his way to deliver the cargo from his employer, Pionna Transport, LLC ("Pionna") in Newark, New Jersey, to Seaman Paper Company in Orange, Massachusetts. *Id.*

---

[2] The following facts are drawn primarily from the parties' statements of material facts pursuant to Local Civil Rule 56.1, Dkt. 86 ("Deft. 56.1 Stmt."); Dkt. 100 ¶¶ 1-43 ("Pl. Counter 56.1 Stmt."); *id.* ¶¶ 44-66 ("Pl. 56.1 Stmt."); the exhibits attached to Philip R. McDaniel's Certification of Exhibits in Support of Defendants' Motion for Summary Judgment, Dkt. 86-1 ("McDaniel Cert."); and the exhibits attached to Nicholas I. Timko's Certification of Exhibits in Opposition to Defendants' Motion for Summary Judgment, Dkt. 100-1 ("Timko Cert."). Unless otherwise noted, the Court cites to only one party's Rule 56.1 Statement where the parties do not dispute the fact, the adverse party has offered no admissible evidence to refute that fact, or the adverse party simply seeks to add its own "spin" on the fact or otherwise dispute the inferences from the stated fact.

The Court also notes that the parties' Rule 56.1 statements at times include legal arguments and conclusions. Rule 56.1 requires parties submitting a motion for summary judgment to include a "separate, short and concise statement . . . of the material facts as to which the moving party contends there is no genuine issue to be tried." Loc. Civ. R. 56.1(a). "Rule 56.1 statements are not argument and must contain factual assertions with citation to the record rather than conclusions." *Pacenza v. IBM Corp.*, No. 04 Civ. 5831 (SCR), 2007 WL 9817926, at *4 (S.D.N.Y. July 26, 2007). Moreover, "legal arguments . . . belong in briefs, not Rule 56.1 statements, and so are disregarded in determining whether there are genuine issues of material fact." *Alliance Sec. Prods., Inc. v. Fleming Co.*, 471 F. Supp. 2d 452, 454 (S.D.N.Y. 2007).

¶ 24; Timko Cert., Exh. 41 ("Bocoum Dep. Tr.") at 103:16-104:8.  According to Plaintiff, he had driven this specific route from Newark to Orange at least fifty times in the ten years preceding the Crash.  Bocoum Dep. Tr. at 113:25-114:11.  Plaintiff also testified that, prior to the Crash, he had operated the Truck every day to make his deliveries and never previously experienced any problems with the Truck.  *Id.* at 91:4-24.

According to Plaintiff, on the day of the Crash, he exited Interstate Route 91 at Route 2 near Greenfield, Massachusetts, and proceeded eastbound on Route 2 reaching a red light at an intersection.  *Id.* at 106:20-108:17.  At this point, Plaintiff was approximately twenty miles from his destination in Orange.  *See id.* at 113:15-17.  Plaintiff testified at his deposition that, after the light turned green, he drove approximately 900 feet when he "hear[d] something on the steering wheel": "I have the steering wheel, I hear moving thing and I could not turn any more, the truck was going to straight.  I try to hit the brake to stop the truck and I hit the guardrail and I continue to flip.  My steering wheel wasn't working at all."  *Id.* at 106:20-107:23.  Plaintiff described the roadway following the intersection as slightly downhill and curving to the right.  *Id.* at 132:22-133:18; *see also* Tucker Dep. Tr. at 30:23-31:3.  Plaintiff recounted that he was unable to negotiate this curve and "the truck just went straight to the guardrail."  Bocoum Dep. Tr. at 134:13-20, 136:3-13.  Massachusetts State Trooper Jason Welch, one of the officers who responded to the Crash, testified that the area around the Crash site is "a very notable corner for tractor trailer rollovers, due to the sharp corner and speed coming from eastbound into the corner."  Dkt. 84-11 ("Welch Dep. Tr.") at 36:1-17; *see also* Tucker Dep. Tr. at 31:20-32:24; Pl. Counter 56.1 Stmt. ¶ 26 (admitting that the Crash occurred at "a sharp curve to the right").

During the Crash, the Truck overturned onto the driver's side, hit the guardrail for the lane going in the opposite direction, and downed a telephone pole and trees.  Pl. Counter 56.1 Stmt. ¶ 30; Bocoum Dep. Tr. at 107:18-23; Welch Dep. Tr. at 28:15-24; McDaniel Cert., Exh. 20

4

(photographs from the Crash scene).  The parties agree that no brake marks were observed at the site of the Crash.  Pl. Counter 56.1 Stmt. ¶ 31; McDaniel Cert., Exh. 15 at 55:3-16.  Plaintiff testified that this is because after he realized that the Steering Gear had failed, he tried to hit his brake, but "it was too late."  Bocoum Dep. Tr. at 132:2-9, 136:8-13 ("I see trouble, it is fast, it is very fast.  You go too fast, you don't have time.  When I did this, it didn't work, the truck went all the way, the truck going already straight.  And then hit the guardrail.  I tried to hit my brake, went into guardrail.").  The parties, however, disagree on whether there were any other marks on the road caused by the Crash.  The Massachusetts State Troopers who responded at the scene testified that the police reports did not note the presence of any skid marks or yaw marks at the site of the Crash, and that they would have included such information in the report had they observed any markings on the road near the site of the Crash.  *See* Tucker Dep. Tr. at 50:14-51:11; Welch Dep. Tr. at 76:15-77:2.  On the other hand, Defendants' proffered accident reconstruction expert, Nicholas Durisek, observed in a photograph taken after the Crash "a tire mark with gouge marks in the pavement next to and on the rumble strips" that Durisek opined "were likely created by the tractor's left-front tire and wheel after the tractor was overturned."  Dkt. 84-2 ("Durisek Report") at 19.

The parties also disagree over the Truck's speed prior to the Crash.  The speed limit at the site of the Crash was thirty-five miles per hour.  Pl. Counter 56.1 Stmt. ¶ 27; McDaniel Cert., Exh. 16 at 31:20-21 (excerpt from Trooper Welch's deposition transcript).  The Truck's GPS data from the date of the Crash measured the Truck as traveling at 32.93 miles per hour approximately ten minutes prior to the Crash.  Durisek Report at 9.  In contrast, Plaintiff's expert, Durisek, calculated the likely speed of the Truck at the time of the Crash as in the range of "40 to 51 miles per hour."  Dkt. 84-5 ("Durisek Dep. Tr.") at 90:4-13; Dkt. 84-15 ("Durisek Speed Calculations") at 4.  Likewise, Trooper Welch testified during his deposition that he had written in the police report

that the Truck "had taken a turn at a high rate of speed and was unable to negotiate the curve in the road." McDaniel Cert., Exh. 16 at 48:10-19.[3] Although Plaintiff does not recall how many miles the Truck had traveled at the time of the crash, Bocoum Dep. Tr. at 91:1-3, Plaintiff's travel log from August 31, 2015—four days prior to the Crash—reported a "Starting Odometer Reading" of 978,631 miles and an "Ending Odometer Reading" of 978,985 miles, McDaniel Cert., Exh. 14; Pl. Counter 56.1 Stmt. ¶ 22; *see also* Dkt. 108-3 (Plaintiff's daily logs from August 1-31, 2015).

### 2.    The Truck

DTNA sold the Truck to the original owner on or about February 22, 2006. Pl. Counter 56.1 Stmt. ¶ 1; McDaniel Cert., Exh. 1 (sale invoice for the Truck). Pionna's affiliate, Perfect Transportation LLC, purchased the Truck on or about May 2, 2013. Pl. Counter 56.1 Stmt. ¶ 12;

---

[3] Plaintiff's medical records from Baystate Medical Center, where he received treatment after the Crash, reflect that Plaintiff told emergency room personnel that he was driving forty-five miles per hour at the time of the Crash. McDaniel Cert., Exh. 17 ("Patient states that he was going approx. 45MPH, he denies hitting his head, denies LoC, denies EtoH."); *see also* Deft. 56.1 Stmt. ¶ 28 ("Plaintiff told emergency room physicians he was driving 45 miles per hour."). Plaintiff denies that to be the case, and objects to the admissibility of this portion of his medical records as hearsay that "does not fall within any exception to the hearsay rule, specifically Rule 803(4), as it was not made for or reasonably pertinent to medical treatment." Pl. Counter 56.1 Stmt. ¶ 28. Plaintiff's statement to the emergency room personnel at Baystate Medical Center is excluded from hearsay and admissible as an opposing party's statement under Federal Rule of Evidence 801(d)(2)(A). His medical records arguably are admissible under the medical records exception under Rule 803(4) or the business records exception under Rule 803(6). Nevertheless, because Defendants have not laid a proper foundation sufficient to satisfy either exception in their summary judgment papers, the Court does not consider this evidence in deciding Defendants' motion for summary judgment. Defendants may, however, seek to introduce this evidence at trial to the extent they are able to lay a proper foundation. *See Djangmah v. Falcione*, No. 08 Civ. 4027 (KPF), 2013 WL 6388364, at *5 (S.D.N.Y. Dec. 5, 2013) (explaining that "introducing apparent hearsay evidence under the medical records exception requires the party seeking introduction to 'lay a foundation'" that the statements were "made for the purposes of diagnosis or treatment"); *id.* at *6 ("Medical records . . . can be admissible under Federal Rule of Evidence 803(6), provided they are prepared in the regular course of business, near the time of occurrence, by a person with knowledge and are properly authenticated. . . . Rule 803(6) explicitly requires that this foundation be laid by a 'custodian' or 'qualified witness,' if testimonial, or by a formal certification by the record's custodian." (internal quotation marks omitted)).

McDaniel Cert., Exh. 8 (purchase and title documents for the Truck); McDaniel Cert., Exh. 10 ("Gonzalez Dep. Tr.") at 36:1-13.  When Perfect Transportation purchased the Truck in 2013, the Truck's odometer registered 729,449 miles.  Pl. Counter 56.1 Stmt. ¶¶ 10, 13.  The Carfax report for the Truck reflects that the Truck was involved in two accidents in 2006 and 2008.  Pl. Counter 56.1 Stmt. ¶ 11.  On or about October 10, 2006, the Truck was involved in an accident in New Jersey, "[i]nvolving right side impact" after "[i]t hit a sign structure / post" and its "[r]ight side [was] primarily damaged."  McDaniel Cert., Exh. 9 (Carfax report) at 2.  The estimated damage from the accident exceeded $500.  *Id.* at 3.  On or about May 9, 2008, the Truck was involved in another accident in Virginia, "[i]nvolving left front impact" after "[i]t hit a guardrail," but its "[a]irbags did not deploy."  *Id.* at 2.  The estimated damage from this second accident exceeded $1,000.  *Id.* at 3.  Aside from the Carfax report, however, no other information regarding the nature or extent of the Truck's prior accidents is available or known to the parties.  Pl. Counter 56.1 Stmt. ¶ 11.

Pionna was responsible for maintaining and keeping the Truck "in good working order." Gonzalez Dep. Tr. at 36:24-37:4; Bocoum Dep. Tr. at 91:25-92:9; Pl. Counter 56.1 Stmt. ¶ 14.  As to the Steering Gear, Pionna's representative, Jose Gonzalez, testified that it is the company's practice to "never do any work on the steering box" and that "[i]f there is something wrong with the steering box, . . . [they] call Freightliner, order a new one and replace it" because "that is actually the most important item in the truck."  Gonzalez Dep. Tr. at 31:3-16; *see also id.* at 37:23-38:9; Pl. Counter 56.1 Stmt. ¶ 20.  When asked about any instructions for inspecting or maintaining the steering box, Gonzalez explained that "[t]here is nothing to inspect, everything is inside the box.  You can inspect it outside, . . . but everything is inside the box.  Unless you have x-ray vision, nothing to do," and added that "we [at Pionna] never open [the box]."  Gonzalez Dep. Tr. at 38:14-25.  Plaintiff, on the other hand, was not responsible for the maintenance of the Truck and did not

have "anything to do with the inspection or maintenance of the steering components of the tractor." *Id.* at 37:5-14; Bocoum Dep. Tr. at 92:24-93:13.  If Plaintiff "had an issue with any of the steering components of the tractor," he would "[c]all [Pionna] and report . . . what the problem was and he would have been told not to move the truck or go to the nearest shop."  Gonzalez Dep. Tr. at 37:15-22.

Pionna's safety manager, Ray Salazar, testified that the company has "access to the DTNA website which has to do with . . . service guidelines" and "repair guidelines," and that Pionna's "mechanic has a computer that . . . [is] loaded with the diagnostic software of Freightliner, so any updates on that" would get "forward[ed] to the mechanic."  Timko Cert., Exh. 35 ("Salazar Dep. Tr.") at 99:25-100:8.  Otherwise, neither Pionna nor Plaintiff received or reviewed any of Defendants' service or maintenance manuals, which were publicly accessible, prior to the Crash.  Pl. Counter 56.1 Stmt. ¶¶ 14, 18; Gonzalez Dep. Tr. at 70:17-20; Salazar Dep. Tr. at 98:13-99:22; Bocoum Dep. Tr. at 202:17-203:17.

### 3.    The Steering Gear

The Steering Gear in the Truck was a THP60010 steering gear, which ZF ASE designed for use in heavy trucks.  Dkt. 87-4 ("Noah Report") at 5; Dkt. 87-7 ("Noah Dep. Tr.") at 16:7-13, 20:1-4.  The purpose of the Steering Gear was to provide directional control of the road wheels through the steering wheel.  *See* Noah Dep. Tr. at 33:4-34:5 (explaining that the purpose of an TPH60010 steering gear is "to provide directional control by transmitting the input torque to the input shaft to the output which is connected to the road wheels").  DTNA's internal specifications for the Steering Gear indicate that the Steering Gear has a "Life Definition" of "1.2 million miles or ten years" and "Reliability Requirement" of "B01 of 1.2E6 miles (no Safety Related Faults)" for "Class 8 Long Haul 50% Customer."  Timko Cert., Exh. 24 ("Steering Gear Specification") at 9.  For a "Class 8 Pick-Up & Delivery 50% Customer," the Steering Gear has a "Life Definition"

of "750 thousand miles or ten years" and "Reliability Requirement" of "B01 of 750,000 miles (no Safety Related Faults)." *Id.* A representative of DTNA testified that "the life target is not . . . an expiration date like you would find on food or medicine, but rather it's a minimum expectation." Timko Cert., Exh. 33 ("Rieflin Dep. Tr.") at 66:11-16. According to DTNA's representative, this means that "vehicles exceeding the life target would be expected to start to incur increased maintenance and repair costs at that time," "[b]ut it can't be taken as the life target is the longest the vehicle could be operated." *Id.* at 66:17-21.

The parties do not dispute that post-Crash examinations of the Steering Gear revealed a fractured worm screw. *See* Dkt. 93-1 ("McElroy Report-1") at 2 ("Disassembly of the steering box revealed that the worm gear had snapped. The snapped worm gear would result in a condition where the truck could no longer be steered by the driver."); Dkt. 91-4 ("Grate Report-1") at 2 ("The fracture would appear to have some degree of a torsional aspect."); Durisek Report at 14 ("The worm screw was fractured at its end nearest the input shaft."); Dkt. 85-3 ("Cheek Report") at 5 ("Figure 4 shows a view of the fractured end of the Worm Screw."); Noah Report at 9 ("The worm shaft is fractured near the upper end of the ball nut helix."). The parties do, however, disagree as to the timing and cause of the fracture. *Compare* McElroy Report-1 at 2 ("Physical damage observed to the front tires, wheels, and suspension as a result of the [Crash] is not consistent with the forces required to fracture a known good worm gear in the steering box."); *with* Durisek Report at 14 ("The impact load marks are consistent with the worm screw being put in tension.") *and* Noah Report at 8 ("The sector shaft shows indications of an impact overload in Figure 5.").

## B.    Procedural History

Plaintiff filed the Complaint on September 1, 2017, in New York Supreme Court, New York County, against Defendants DTNA, TRW Automotive U.S. LLC, TRW Vehicle Safety

Systems Inc., ZF TRW Automotive Holdings Corp., and ZF Friedrichshafen AG. Dkt. 1-1. On October 5, 2017, DTNA removed the action to this Court on the basis of diversity jurisdiction under 28 U.S.C. § 1332(c)(1). Dkt. 1.[4] DTNA and ZF ASE filed their Answers to the Complaint on October 12, 2017 and November 13, 2017, respectively. Dkts. 7, 13. On October 18, 2017, the parties filed a stipulation of voluntary dismissal without prejudice as to TRW Vehicle Safety Systems Inc., ZF TRW Automotive Holdings Corp., and ZF Friedrichshafen AG, Dkt. 10, which the Court approved the following day, Dkt. 11. On November 17, 2017, Plaintiff filed an Amended Complaint. Dkt. 14 ("Am. Compl.").

On March 5, 2021, Defendants moved for summary judgment on all of Plaintiff's claims. Dkts. 83 ("SJ Motion"), 86. Defendants also moved to exclude the testimony of Plaintiff's proffered experts, Grate, Dkt. 91, and McElroy, Dkts. 92-93. Plaintiff moved to exclude the testimony of Defendants' proffered experts, Durisek, Dkts. 84, 88, Cheek, Dkts. 85, 89, and Noah, Dkts. 87, 90.[5] Defendants requested oral argument on their motion for summary judgment and motions to exclude the testimony of Plaintiff's proffered experts. Dkt. 77. Plaintiff requested oral argument on his motions to exclude the testimony of Defendants' proffered experts. Dkt. 79. On March 15, 2021, Plaintiff filed his oppositions to Defendants' motion for summary judgment, Dkts. 100-101, and Defendants' motions to exclude the testimony of Grate and McElroy, Dkts. 96-99. That same day, Defendants filed their oppositions to Plaintiff's motions to exclude the testimony

---

[4] The parties agree that venue is proper in this District "because Defendants removed to 'the district court of the United States for the district and division within which such action [was] pending,' which is the Southern District of New York." Dkt. 112 at 3 (citing 28 U.S.C. §§ 1441(a), 1446(a)).

[5] Defendants' motion for summary judgment and the parties' respective motions to preclude expert testimony were initially filed on March 2, 2021. Due to docketing issues, the parties refiled their motions on March 5, 2021.

of Durisek, Cheek, and Noah.  Dkts. 94-95, 102.  On March 22, 2021, the parties filed their

respective reply papers.  Dkts. 105-110.

## II.    Motions to Preclude Expert Testimony

As noted, in conjunction with Defendants' motion for summary judgment, the parties have

filed motions, pursuant to Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow*

*Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to exclude proffered expert testimony that the other

side intends to present at trial.  Defendants seek to exclude expert opinions from Grate and

McElroy.  Plaintiff seeks to exclude expert opinions from Durisek, Cheek, and Noah.

As a result, the Court must first decide whether the opinions proffered by the parties'

experts are admissible before proceeding with ruling on Defendants' motion for summary

judgment.  *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) ("The summary

judgment standard requires a court to 'consider all relevant, admissible evidence.'" (citation

omitted)); *Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 68 (S.D.N.Y. 2001) ("[T]he

court must evaluate evidence for admissibility before it considers that evidence in ruling on a

summary judgment motion." (citing Fed. R. Evid. 104(a))).  "If a proffer of expert testimony is

excluded as inadmissible pursuant to Rule 702, the court must make the summary judgment

determination on a record that does not include that evidence."  *Colon ex rel. Molina*, 199 F. Supp.

2d at 68 (citation omitted)*.*  The standard for admissibility of expert testimony at the summary

judgment stage is the same as it is at trial.  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997)

("On a motion for summary judgment, disputed issues of fact are resolved against the moving

party. . . .  But the question of admissibility of expert testimony is not such an issue of fact.").

## A.    Legal Standard

Federal Rule of Evidence 702, which governs the admissibility of expert and other

scientific or technical testimony, provides that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.[6]  The district court has "broad discretion to carry out this gatekeeping function" under Rule 702, *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016), which "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge," *Kumho Tire Co., Ltd.*, 526 U.S. at 141; *see also 523 IP LLC v. CureMD.Com*, 48 F. Supp. 3d 600, 641 (S.D.N.Y. 2014) ("It is well-established that the trial judge has broad discretion in the matter of the admission or exclusion of expert evidence." (quoting *Boucher v. United States Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996))).  As the Supreme Court made clear, "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co., Ltd.*, 526 U.S. at 142.  Notwithstanding this flexibility, Rule 702 requires that "expert testimony rest on 'knowledge,' a term that 'connotes more than subjective belief or unsupported

---

[6] In *Daubert*, the Supreme Court set forth four non-exhaustive factors to determine the reliability of an expert's reasoning or methodology: (i) whether the theory or technique relied on has been tested; (ii) whether the theory or technique has been subjected to peer review and publication; (iii) whether there is a known or potential rate of error and the existence and maintenance of standards controlling the technique's operation in the case of a particular scientific technique; and (iv) whether the theory or method has been generally accepted by the scientific community.  509 U.S. at 593-94.  The Supreme Court, however, emphasized that "[t]he inquiry envisioned by Rule 702 is . . . a flexible one," *id.* at 594, and "*Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case," *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

speculation.'" *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 559 (S.D.N.Y. 2004) (quoting *Daubert*, 509 U.S. at 590).

Under this framework, a district court's Rule 702 inquiry involves the assessment of (1) the qualifications of the expert to testify as to a particular matter, (2) the reliability of the methodology and underlying data employed by the expert, and (3) the relevance of the expert's testimony (*i.e.*, whether the expert's testimony as to a particular matter will "assist the trier of fact"). *Nimely v. City of New York*, 414 F.3d 381, 396-97 (2d Cir. 2005). "Nothing in *Daubert*, or any other Supreme Court or Second Circuit case, mandates that the district court hold a *Daubert* hearing before ruling on the admissibility of expert testimony, even where such ruling is dispositive of a summary judgment motion." *Colon ex rel. Molina*, 199 F. Supp. 2d at 71. In addition, the Second Circuit has instructed that a district court "should exclude expert testimony if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison," but that "other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009) (citations, internal quotation marks, and modification omitted). Thus, "[o]nly if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Hollman v. Taser Int'l Inc.*, 928 F. Supp. 2d 657, 670 (E.D.N.Y. 2013). Ultimately, the party offering the testimony has the burden of establishing its admissibility by a preponderance of the evidence. *See Daubert*, 509 U.S. at 592 n.10 ("Preliminary questions concerning the qualification of a person to be a witness . . . should be established by a preponderance of proof." (quotation marks omitted)); *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016) ("The proponent of the expert testimony has the burden to establish these admissibility requirements.").

B.      **Plaintiff's Experts**

1.      **Frank Grate**

Plaintiff retained Frank Grate to "testify as an expert witness in the field of engineering, metallurgical engineering and testing . . . regarding his inspection, review, and analysis of the steering gear and worm gear from the subject vehicle." Dkt. 91-2 at 2. Grate is a licensed Professional Engineer with over thirty years of experience. Dkt. 96-2 at 7. Grate graduated from the University of Cincinnati with a Bachelor of Science degree in Engineering in 1970. *Id.* He is a member of a number of professional societies, including the National Society of Professional Engineers, the American Society of Metals, the American Welding Society, and the American Society of Mechanical Engineers. *Id.*

On November 12, 2015, Grate issued a report in which he offered the following conclusions:

> The worm input shaft failed in a high bending stress with some torsional loading. There is some degree of fatigue indicated but this would be of a very short time period. The shaft did not appear to be defective as it was manufactured from a good quality steel and the only heat treated condition observed was retained austenite in the case of 15%. It is not known if this is acceptable to this particular component part.
>
> One thing observed was that this worm gear did have a secondary crack along with some impact marks left from the balls which aid in the steering. It also seems that other investigators have shown failures of this component in other trucks. This would indicate the possibility that some future inspection needs to be done during rebuilding of the steering box. The general inspection specified in the manual indicates that the worm gear should be replaced if there are any brinelling marks on the surface caused by the ball bearings. This shaft had these type marks. One recommendation which would improve the detection of previous damage would be to have the worm input shaft magnetic particle inspected for cracks which may not be seen with the naked eye. The second item observed is that the hole in the one end of the worm input shaft is where most of the failures take place. This would appear to be the result of the small cross-section at this location due to the drilled hole. It may be advantageous to stop drilling as deep, preventing the reduced area in front of the bearing.

Grate Report-1 at 2-3.   On December 6, 2019, Grate submitted an addendum to his report, concluding that "[t]here were no indications found regarding any type of inspection required on the truck even though it was over a million miles" and that "[t]here should be some inspection criteria specified to detect damage and to prevent failure from occurring."   Dkt. 91-6 ("Grate Report-2").

> ### a.     Grate's Opinion Regarding the Effect of the Heat Treatment on the Steering Gear

Defendants argue that the Court should exclude any testimony from Grate "suggest[ing] the heat treatment and resulting composition for the worm gear steel might be deficient" on the basis that Grate "is not qualified as a product manufacturing expert and has done nothing to consider the hardening requirements, specifications, and drawings from the worm gear." Dkt. 91 at 3.  In support, Defendants cite portions of Grate's deposition testimony where he admitted that "[he] can't tell . . . if the heat treatment was good or bad, because [he does not] know what the standard is." Dkt. 96-4 ("Grate Dep. Tr.") at 42:1-3; *see also id.* at 135:15-19 ("Again, it depends on what the heat treatment is supposed to be.  The heat treatment there was indicating it was not very hard, okay?  The core was not hardened very hard.  But if that's what it's supposed to be, then I have no problem.").

The Court declines to exclude Grate's testimony regarding the heat treatment of the steel for the Steering Gear.  As a threshold matter, Defendants mischaracterize Grate's opinion.  At no point has Grate purported to "suggest" that "the heat treatment and resulting composition for the worm gear steel might be deficient," as Defendants contend.   To the contrary, Grate plainly acknowledged in his report that "[t]he shaft did not appear to be defective as it was manufactured from a good quality steel," that "the only heat treated condition observed was retained austenite in the case of 15%," and that he did not know "if this is acceptable to this particular component part."

Grate Report-1 at 2-3.  Grate's deposition testimony was consistent with the observation that he rendered in his report.  *See* Grate Dep. Tr. at 42:1-3, 135:15-19.

Moreover, the Court finds that Grate's testimony in this respect would be admissible under Rule 702.  First, Grate is qualified based on his education and experience to offer an expert opinion regarding the heat treatment.  Grate has over thirty years of experience as a materials engineer. Dkt. 96-2 at 7; Grate Dep. Tr. 8:23-9:14 ("I'm a materials engineer.  I look at almost anything metallic or plastics or fiberglasses and this type of a thing. . . .  Most of what I'm going to be involved with is going to be materials science somewhere along the time, why did it fail, what is the properties of it, is it any good, does it meet the standard, does it not meet the standard, that type of thing.").  He also has given presentations to technical societies, including American Academy of Forensic Sciences and the American Society of Non-Destructive Testing, on failure analysis and forensic engineering.  Dkt. 96-2 at 8.  Earlier in his career, Grate was responsible for "evaluating the corrosion and mechanical properties of ferrous and non-ferrous alloys." *Id.*  Grate also worked on fracture mechanics and failure analysis on engine components, including "effects [of] metal joining, microstructure, metal integrity and non-conventional machining techniques on mechanical properties," and wrote confidential papers on these topics.  *Id.*  Second, Grate's observation regarding the heat treatment on the metal was the result of reliable scientific methods, as well as his personal knowledge and experience as a forensic engineer.  Grate testified during his deposition that he conducted a "hardness test" on the Steering Gear, and "determined what the alloy is, how it was heat-treated, how strong it was."  Grate Dep. Tr. at 78:13-20.  Third, Grate's observation would assist the trier of fact in understanding the condition and quality of the Steering Gear.

### b.      Grate's Opinion Regarding the Steering Gear's Design

Defendants seek to exclude Grate's observation that "the hole in the one end of the worm input shaft is where most of the failures take place" and his recommendation that "[i]t may be advantageous to stop drilling as deep, preventing the reduced area in front of the bearing."  Grate Report-1 at 3.  Defendants contend that Grate is not qualified to opine on any potential design defects in the Steering Gear because Grate "admits he is not qualified as a product design expert and is not a[] [Society of Automotive Engineers] engineer."  Dkt. 91 at 4; *see also* Grate Dep. Tr. at 64:9-12 ("Q. Are you saying and is it your opinion that the worm gear is defective because of the size of this hole?  A. That depends.  You have to know what the loading value is, and I don't know that."); *id.* at 65:7-13 ("Q. [I]t's not your opinion that the worm gear is defective because of the size of the hole?  A. Not totally, no, because, again, I don't know whether or not it's even as hard as it's supposed to be.  I can't tell you the right strength or the right alloy and being treated properly.  I don't know."); *id.* at 45:7-11 (Q. Okay.  Kind of along the same lines, in terms of the product design and manufacturing, you're going to leave those opinions to Dr. McElroy as well, right?  A. I would have to, because I'm not really involved in the design of this part.").

The Court, however, need not decide whether Grate is qualified to provide a design opinion because Plaintiff expressly disclaimed a design defect claim in his motion to exclude a design opinion by Defendants' expert, Noah.  *See* Dkt. 90 at 7 ("However, opinion 3 addresses the design. Since there is no design claim, the opinion is irrelevant, unnecessary, and will not assist the trier of facts.").  Echoing Plaintiff's argument, because Plaintiff is not advancing a design defect claim, Grate's opinion on the design of the Steering Gear "is irrelevant, unnecessary, and will not assist the trier of facts."  Accordingly, given Plaintiff's disclaimer, Grate is precluded from offering any testimony regarding the design of the Steering Gear at trial.  *See Daubert*, 509 U.S. at 591 ("Expert

testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."
(internal quotation marks omitted)).

### c.   Grate's Opinion Regarding the Cause of the Fracture of the Worm Screw in the Steering Gear

Defendants seek to exclude Grate's opinion regarding the cause of the fracture of the worm
screw in the Steering Gear on two main bases.  First, Defendants argue that exclusion is warranted
because Grate "equivocated" at his deposition when asked about the timing of the fracture.  Dkt.
91 at 5-6.  But Grate never purported to opine on the timing of the fracture, nor does such a finding
appear to be within the scope of Grate's expertise.  As Grate testified during his deposition, "most
of what [he was] involved in was the actual failure, what mechanism, et cetera, of that steering
gear," Grate Dep. Tr. at 35:12-14, and "[t]he only thing [he] did was look at the worm gear and
take a look to see what was the mode of failure, and [he] can't tell any more than that . . . because
[he does not] know," *id.* at 38:3-7.  In fact, when asked by defense counsel whether he could
determine "how much time passed between the initial crack and the failure," Grate testified that
he could not make such determination because "[t]he only way you can do that would be if you
really had a history of all the damages that might have happened to the truck during any of its past,
things that it went through that may have started this."  *Id.* at 120:15-121:17.

Second, Defendants argue that the Court should exclude Grate's causation opinion because
he "went on to opine about 'possible' alternative causes of the crack, including hitting a pothole
or curb," despite having "no specific information about any such impact during the operating
history of the truck," "no understanding of the forces associated with a pothole strike or a curb
strike," and "no basis in facts, data, or methodology to offer his alternative causation opinion."
Dkt. 91 at 6-7.  When asked what he thought initiated the crack, Grate responded that "it had to
have been a load higher than the fatigue strength of the material" and provided a pothole or a curb

as examples to illustrate his point, but expressly stated that he "do[es] not know what all the other accidents that the truck went through." Grate Dep. Tr. at 121:21-122:17. Thus, Grate's proffered causation opinion would not express mere "possibilities" as Defendants contend, but rather would opine on the cause of the fracture of the worm screw in the Steering Gear and provide examples to further assist the trier of fact. The Court finds this testimony admissible under Rule 702.

### d.    Grate's Opinion Regarding Defendants' Manuals

Lastly, Defendants seek to exclude Grate's opinion regarding Defendants' manuals because Grate is "not qualified by knowledge, skill, experience, training, or education to opine about manuals and warnings." Dkt. 91 at 7. The Court agrees. Grate's *curriculum vitae* does not indicate any education, training, or experience on maintenance manuals, and he confirmed this fact during his deposition.[7] Dkt. 96-2 at 7-21; Grate Dep. Tr. at 50:10-14 ("Q. Do you have any training, education or experience related to heavy truck warnings, maintenance or inspection procedures?  A. No, except for what I was reading in the manual."); *id.* at 49:12-15 ("Q. Okay. Have you ever written a maintenance procedure manual?  A. My own equipment yes.  Other people's equipment, I don't think I've ever done that, no."). And while Grate did testify that he wrote a procedure manual for using and maintaining equipment in his lab, and that he had reviewed various manuals, including Defendants' maintenance manuals, this is insufficient to qualify him as an expert to opine on what instructions or warnings should have been included in Defendants' manuals. *Id.* at 49:17-25 ("Q. What do you mean your own equipment?  What does that mean when you say that?  A. We have lots of equipment at the lab, equipment like tensile machines and

---

[7] While not dispositive, when asked during his deposition whether he has been qualified as an expert in warnings in other cases, Grate testified that he has "done a few," mostly dealing with ladders, but was unable to identify a specific case from his testimony list. Grate Dep. Tr. at 48:18-49:11.

stuff like that, that I might write something regarding in our procedure manual about . . . some of the equipment that needs to be controlled and tested at times.  My hardness tester, you need to lubricate it once in a while, different things."); *id.* at 50:10-20 (testifying that his experience relating to heavy truck warnings, maintenance, or inspection procedures comes from reading manuals including the one for the Truck).

*     *     *

For the reasons stated above, Defendants' motion to exclude Grate's proffered expert testimony is granted in part and denied in part.  Grate may testify at trial regarding the effect of the heat treatment on the Steering Gear and the cause of the fracture of the worm screw in the Steering Gear.  Grate may not offer expert testimony regarding the design of the Steering Gear or the adequacy of Defendants' manuals.

### 2.      Robert McElroy

Plaintiff also seeks to offer expert opinions from Robert McElroy, Ph.D., as an industrial safety engineer, reconstructionist, and vehicle failure analysis expert.  Dkt. 98-1 at 2.  McElroy graduated from Salem College in 1970 with a Bachelor of Science degree in Industrial Technology. *Id.* at 7.  He received a master's degree in Industrial Education from East Carolina University in 1971 and a Ph.D. in Industrial Safety Engineering and Industrial Education from Texas A&M University in 1979. *Id.*  McElroy has conducted numerous lectures and instructional programs, and published his works in a number of industry magazines and journals. *Id.* at 12-14.  McElroy is a member of several professional associations, including the Society of Automotive Engineers. *Id.* at 13.

In his initial expert report dated November 17, 2015, McElroy offered eight opinions regarding the cause of the Steering Gear's failure:

1. Physical damage observed to the front tires, wheels, and suspensions as a result of the 09/04/15 accident is not consistent with the forces required to fracture a known good worm gear in the steering box.

2. TRW Automotive "THP/PCF Steering Gear Service Manual" Section 4, Reseal and Repair begins with Inspection which only addresses visual and tactile inspection. Inspection of the steering gear should be expended to include magnetic particle inspection for cracks in the worm shaft which may not be seen by the naked eye.

3. The worm shaft was structurally compromised by fractures before the accident.

4. Manufacturing techniques for the worm shaft include a hole drilled into the top of the worm shaft to permit attachment of a splined spud connector for attachment to the steering universal joint connector. Depth of the hole drilled into the top of the worm shaft significantly reduces the structural integrity of the worm shaft. The subject worm shaft fractured in the area where the hole was drilled.

5. Metallurgical and internal visual inspection of the subject steering gear does not permit an opinion to be reached with regard to the worm shaft failing and causing the accident or impact forces causing the steering gear to fail.

6. Inspection of the 2007 Freightliner showed no evidence of impact damage to the tires or wheels which would have been responsible for the fracture of the worm shaft.

7. The worm shaft fractured while the Freightliner was being driven and failure of the worm shaft is responsible for the accident.

8. TRW needs to update the steering gear service procedures to include a time and distance operation interval which would specify when the steering gear should be removed from the vehicle, disassembled, and inspected; to include magnetic particle inspection.

McElroy Report-1 at 2. McElroy supplemented his report on December 6, 2019 with three additional sets of opinions:

DTNA and TRW did not provide adequate warning associated with maintenance of steering gears beyond one million miles. As such, the vehicle component was defective in that there was no warning to users of the foreseeability of steering failure during duty cycle, or as a result of impacts and internal damage, which required visual and or magnetic particle inspection at certain intervals or with certain events.

DTNA and TRW would have a breach of implied warranty because they did not advise customers of life target or end-of-life maintenance.

> As an accident reconstructionist, post-crash inspection of the subject vehicle did not show evidence of damage which would result in steering gear failure.

Dkt. 93-2 ("McElroy Report-2") at 3.

### a.    McElroy's Opinion Regarding the Nature of the Crash

McElroy opined in his report that the "[p]hysical damage observed to the front tires, wheels, and suspension as a result of the [Crash] is not consistent with the forces required to fracture a known good worm gear in the steering box."  McElroy Report at 2.  And at his deposition, McElroy testified that he "looked at the wheels," "looked at the rims," and "looked at the undercarriage," and saw "no significant trauma" based "entirely on [his] visual observation." Dkt. 98-3 ("McElroy Dep. Tr.") at 67:8-17.  McElroy admitted, however, that he "ha[s] not done any calculations in this case" and did not do "any kind of analysis of damage other than simply inspecting the vehicle."  *Id.* at 80:4-17.  But despite failing to do any calculations, McElroy estimated that the Truck was going "relatively low speed" and "below 35 miles an hour" at the time of the Crash.  *Id.* at 78:20-79:5.  Defendants' main objection to McElroy's opinion regarding the nature of the Crash is that he did not perform an accident reconstruction, calculate the forces exerted on the Truck during and as a result of the Crash, and did not download the Truck's engine control module.  Dkt. 92 at 5-6.  Rather, according to Defendants, McElroy's opinion is based solely on "his visual inspection of the truck."  *Id.* at 6.

The Court concludes that McElroy may testify as to the physical damage observed on the Truck and whether, based on McElroy's observations and experience, such damage is consistent with the forces required to fracture a steering gear.  As McElroy testified during his deposition, from his perspective, an accident reconstruction was not necessary to determine whether the Steering Geer failed as a result of the Crash because "[t]he inspection of the physical components tells the story and [he has] interpreted the story and provided the opinions that [he] ha[s] based

upon the inspection of the tractor post event and the steering box."  McElroy Dep. Tr. at 65:23-66:8.  Defendants in their motion do not contend that McElroy is not qualified to opine on the nature of the Crash based on his experience and observations, or that conducting an accident reconstruction is the *only* way to ascertain the nature of the Crash.  *See generally* Dkt. 92.  Thus, while Defendants may challenge McElroy's credibility as to the necessity of an accident reconstruction in this case and the factual sufficiency of McElroy's observations and his conclusions during cross-examination at trial, such challenges go to weight and not admissibility.

That said, without McElroy having performed any calculations regarding the speed of the Truck at the time of the Crash, the Court finds too great an analytical gap between the data and McElroy's conclusions regarding the speed of the Truck.   Any speculation from McElroy regarding the speed of the Truck, including that the Truck was going "below 35 miles an hour at the time of the Crash," McElroy Dep. Tr. at 78:20-79:5, is therefore excluded.  *See, e.g.*, *Crappell v. Boh Bros. Constr. Co., LLC*, No. 06 Civ. 1315, 2011 WL 13213835, at *3-4 (E.D. La. Jan. 10, 2011) (excluding testimony by civil and structural engineer regarding failure of pre-cast concrete pile based solely on visual inspection of the failed pile that was not supported by any measurements or calculations).

### b.    McElroy's Opinion Regarding the Fracture of the Worm Screw in the Steering Gear Prior to the Crash

Defendants argue that the Court should exclude McElroy's opinion that "the worm screw separated before Plaintiff's crash" because it is "a speculative hypothesis based solely on McElroy's *ipse dixit*." Dkt. 92 at 10.  The Supreme Court has made clear that "the test of reliability is 'flexible,'" but "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Kumho Tire Co.*, 526 U.S. at 141, 157; *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d

230, 284 (E.D.N.Y. 2007) ("Subjective methodology, as well as testimony that is insufficiently connected to the facts of the case" can serve as "grounds for rejection of expert testimony.").  In assessing whether expert testimony is reliable, a court must "undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).  This means that, in order to be admissible, "[a]n expert opinion requires *some explanation* as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion." *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006) (emphasis added), *aff'd on other grounds*, 552 U.S. 312 (2008).

Here, McElroy did not identify any methodology, reliable or otherwise, that he applied in concluding that the worm screw separated before Plaintiff's crash.[8]  For example, McElroy opined in his initial report that "[t]he worm shaft was structurally compromised by fractures before the accident."  McElroy Report-1 at 2.  But when asked about this opinion during his deposition, McElroy testified that "[t]he thing is that if it hadn't have been structurally compromised before the [Crash], then it wouldn't have broke."  McElroy Dep. Tr. 101:23-25.  In his opposition, Plaintiff

---

[8] It is also questionable whether McElroy is qualified to opine on the purported fractures in the Steering Gear prior to the Crash.  When asked about the prior fractures, including when the prior fractures occurred, the number of prior fractures, and the cause of the prior fractures, McElroy deferred to Grate.  *See, e.g.*, McElroy Dep. Tr. at 101:19-22 ("Q. How many prior fractures did the worm shaft suffer prior to the accident?  A. I think Mr. Grate is in a better position to talk about the numbers."); *id.* at 103:12-15 ("Q. Okay.  Can you tell me where on the worm gear these fractures were or is that something you're going to leave to Mr. Grate?  A. Oh, I'll leave that to him."); *id.* at 104:14-19 ("Q. You can't tell me when those fractures occurred?  A. That is correct. Q. Can you tell me what caused those fractures?  A. I would probably leave that to Mr. Grate to deal with the energy that went into the component.").  The Court, however, does not decide this issue in resolving Defendants' motion to exclude McElroy's expert testimony regarding the worm screw fracture.

doubles down on McElroy's testimony, stating that "the fact that the worm gear was found to be fractured is itself strong evidence of the fact that it was structurally compromised." Dkt. 99 at 19 (emphasis removed). But such "circular reasoning fails to reveal a sufficiently rigorous analytical connection between his methodology and his opinion." *Baker v. Anschutz Exploration Corp.*, No. 11 Civ. 6119 (CJS), 2016 WL 981858, at *4 (W.D.N.Y. Mar. 15, 2016); *see also Pierce v. City of New York*, No. 16 Civ. 5703 (BMC), 2017 WL 2623857, at *4 (E.D.N.Y. June 16, 2017) ("Considering the proffered testimony, coupled with the lack of reasoning and methodology behind the testimony and the clear gaps in analysis, this Court was left with the firm conclusion that 'there is simply too great an analytical gap between the data and the opinion proffered.'" (quoting *Gen. Elec. Co.*, 522 U.S. at 146)); *Sec. & Exch. Comm'n v. Tourre*, 950 F. Supp. 2d 666, 678 (S.D.N.Y. 2013) (holding that the expert's "testimony that his opinion as to 'economically material' information is based on 'economic logic' is simply a form of inadmissible ipse dixit").

In opposing Defendants' motion to exclude McElroy's testimony, Plaintiff also asserts that McElroy's opinion regarding the condition of the Steering Gear is based on "DTNA's own specifications, which admit that the gear had an estimated life span of between 750,000 and 1.2 million miles," "the testimony of ZF corporate representative Noah that the worm shaft would be weakened in the event it experienced 'abuse, alteration, impact or overloading damage,'" and the Carfax history for the Truck. Dkt. 99 at 17-18. But McElory offers no cognizable methodology to bridge the logical gap between these facts and his conclusion. In other words, the mere facts that the Steering Gear "was not new" and that it had an estimated life span of between 750,000 and 1.2 million miles, or that it previously was involved in two accidents, without more, do not support McElroy's opinion that the Steering Gear separated before, and not as a result of or during, the Crash. This is precisely the type of opinion evidence that is connected to existing data only by the *ipse dixit* of the expert, which courts have held inadmissible under Rule 702 and *Daubert*. *See,*

*e.g.*, *Scentsational Techs., LLC v. Pepsi, Inc.*, No. 13 Civ. 8645 (KBF), 2018 WL 1889763, at *6 (S.D.N.Y. Apr. 18, 2018) (excluding expert testimony as "*ipse dixit*, pure speculation, or both" where the proffered expert set forth no methodology and "the analytical gap between known facts and [the expert]'s assertions is enormous"); *Munn v. Hotchkiss School*, 24 F. Supp. 3d 155, 202 (D. Conn. 2014) (observing that testimony may "be excluded or stricken if the expert unjustifiably extrapolates from an accepted premise to an unfounded conclusion (an analytic gap or attenuation between data and conclusion)").  Because McElroy's opinion regarding the fracture of the Steering Gear does not appear to be based on a reliable methodology, McElroy's testimony on this opinion is inadmissible.

### c.   McElroy's Opinion Regarding Modifying Defendants' Manuals to Include Visual and Magnetic Particle Inspection at One Million Miles

Defendants seek to exclude McElroy's opinion that "DTNA and [ZF ASE] did not provide adequate warning associated with maintenance of steering gears beyond one million miles." McElroy Report-2 at 3.  Defendants argue that McElroy's opinion regarding the inspection at one million miles lacks a factual basis and is "based upon his incorrect assumption that the subject truck-tractor traveled over one million miles before Plaintiff's crash, without any factual support for this assumption."  Dkt. 92 at 11.  Defendants also argue that "McElroy does not have the requisite knowledge, skill, experience, training, or education to offer opinions about the content of owners or service manuals for heavy trucks and/or their component parts."  *Id.*  Starting with McElroy's qualification, the Court finds that McElroy is qualified to opine on the contents of Defendants' manual.  McElroy testified that his areas of expertise include maintenance procedures, McElroy Dep. Tr. at 50:21-51:2, including "with regard to the inspection sequence and/or protocol that would be utilized for collision analysis for tractor-trailers," *id.* at 95:2-7.

As to reliability, however, the Court finds that McElroy's opinion regarding the adequacy of Defendants' manuals is not based on a reliable foundation.  McElroy in fact admitted that his opinion does not rest on any scientific foundation:

> Q.  And has your opinion about the inspection procedure and the manual, has that been subject to any type of peer-reviewed publication?
>
> A.  No.
>
> Q.  Are there any standards, industry standards, that apply to the inspection procedures that should go in these manuals?
>
> A.  In the automotive industry associated with the subject component I'm not aware of it.
>
> Q.  Is the disassembly and magnetic particle inspection of the steering gear at one million miles, is that something that's generally accepted in the automotive world?
>
> A.  I think it's a new topic and we're breaking the ground for it today.
>
> Q.  Okay.  So is the answer to that no?  No, it hasn't been accepted yet.  Is that a fair statement?
>
> A.  That is correct.  At least not that I'm aware of.  I haven't seen anything to that effect.
>
> Q.  Are you aware of what other litigation experts in heavy truck cases recommend for inspection procedures in manuals?
>
> A.  No.
>
> Q.  Are there any governmental regulations that apply to inspection and [magnetic particle inspection] at one million miles?
>
> A.  Not that I'm aware of.

*Id.* at 171:12-172:13.  McElroy also admitted that he had not "attempted to research other manufacturers' documents" to determine whether "other manufacturer[s], heavy truck manufacturer[s], component part manufacturer[s] ha[ve] included such an inspection procedure in their manuals" and when asked about whether he was "aware of any testing or studies that evaluate the effectiveness of magnetic particle inspection," McElroy simply responded: "I would leave that

to the metallurgist to defend the integrity of their inspection methodology." *Id.* at 170:12-171:2. In sum, McElroy expressly acknowledged that he did not have "any bases in testing or studies that support [his manual] opinion." *Id.* at 171:3-10. Accordingly, McElroy's opinion regarding modifying Defendants' manuals to include visual and magnetic particle inspection at one million miles lacks reliability and is not admissible at trial.

### d. McElroy's Opinion Regarding Design or Manufacturing Defects

Defendants seek to preclude McElroy from offering expert testimony regarding any design or manufacturing defects. During his deposition, McElroy expressly disclaimed that he was an expert in the design or manufacture of steering gears, or that he was offering any opinion as to design or manufacturing defects of the Steering Gear. McElroy Dep. Tr. at 88:13-17 ("Q. Are you an expert in steering gear design? A. No. Q. Are you an expert in steering gear manufacture? A. No."); *id.* at 88:23-25 ("Q. Are you offering any opinions in this case that the steering gear has a manufacturing defect? A. No."); *id.* at 138:6-10 ("Q. Do you know what the design safety factor is for the worm screw? A. No."). Plaintiff also does not appear to oppose the exclusion of McElroy's design or manufacturing defect opinions, if any, in his opposition to Defendants' motion. *See generally* Dkt. 92. Accordingly, McElroy is precluded from offering expert testimony regarding any design or manufacturing defects at trial.[9]

\*   \*   \*

For the reasons discussed above, Defendants' motion to exclude the expert testimony of McElroy is granted in part and denied in part. McElroy's opinion regarding the nature of the crash based on his visual inspection of the physical damage to the Truck is admissible, but he may not

---

[9] Exclusion of any design claim by McElroy is appropriate for the additional reason that, as discussed above in the context of Grate's proffered expert testimony, Plaintiff has disclaimed any design claim. Dkt. 90 at 7.

offer any testimony as to the estimated speed of the Truck at the time of the Crash. McElroy's opinions regarding the cause of the fracture of the Steering Gear prior to the Crash, the adequacy of Defendants' manuals, and any design or manufacturing defects are not admissible and McElroy may not offer expert testimony as to these matters at trial.[10]

## C.    Defendants' Experts

### 1.    Nicolas Durisek

Nicolas Durisek, Ph.D., is an accident reconstruction expert with over twenty-seven years of automotive engineering experience. Durisek Report at 3. He earned a Bachelor of Science in 1992, a Master of Science in 1993, and a Doctor of Philosophy in 1997 in mechanical engineering at The Ohio State University. *Id.* From 1997 to 2001, he was employed by Ford Motor Company, first as a Product Development Engineer and later as a Senior Project Engineer and a Program Analyst, where he worked on design and testing of vehicles related to vehicle dynamics, ride control, and limit handling, among other things. *Id.* at 3, 31. Since 2001, Durisek has been employed as an automotive engineering consultant, which entails him "specializing in the analysis of crash reconstruction, failure analysis, vehicle dynamics, vehicle electronic stability control, advanced driver assistance systems, vehicle design, and vehicle crashworthiness and airbag deployment." *Id.* at 4. As part of his work, Durisek has conducted "numerous crash tests including vehicle-to-barrier, vehicle-to-vehicle, and sled tests to evaluate, in part, overall vehicle motion,

---

[10] As discussed below, *see* Section II.D., the Court dismisses Plaintiff's warranty claim as time-barred. Thus, McElroy's opinion that "DTNA and TRW would have a breach of implied warranty because they did not advise customers of life target or end-of-life maintenance" would be inadmissible for lack of relevance. McElroy Report-2 at 3. McElroy's breach of implied warranty opinion also would not be admissible because, although an expert may opine on an issue of fact, an expert may not give testimony stating ultimate legal conclusions based on those facts. *Celebrity Cruises Inc. v. Essef Corp.*, 434 F. Supp. 2d 169, 191 (S.D.N.Y. 2006) ("Expert testimony that merely states a legal conclusion must be excluded.").

response, and crashworthiness." *Id.* He also has performed "numerous tests to evaluate vehicle performance before, during, and after the disablement of various steering components, suspension components, and tires." *Id.* Durisek is a registered professional engineer in Alabama, Ohio, South Carolina, and Texas, and is a member of the Vehicle Dynamics Standards Committee of the Society of Automotive Engineers. *Id.* He also has published peer-reviewed articles related to his testing and research. *Id.*

Defendants retained Durisek to testify in the areas of accident reconstruction, vehicle dynamics and handling, and vehicle crash causation analysis, among other things. Dkt. 84-1 ("Defendants' Expert Disclosures") at 1-2. Durisek rendered two opinions that are relevant for the purposes of Plaintiff's *Daubert* motion: first, Plaintiff caused the Crash by driving at a speed that was higher than the posted speed limit; and second, the worm screw in the Steering Gear did not fracture before the Truck overturned but, rather, "the worm screw fractured from the higher than design loads that occurred during the overturn." Durisek Report at 23.

> a.    **Durisek's Opinion Regarding the Speed of the Truck before the Crash**

Plaintiff argues that "Durisek's opinion that Plaintiff was speeding prior to the crash must be excluded because it is based on unsound interpretation of GPS data and is otherwise devoid of support in the record." Dkt. 88 at 7. To the extent Plaintiff's argument is premised on an assumption that Durisek relied on GPS data to calculate the speed of the Truck before the Crash, Durisek has attested that his "speed calculations were independent of the GPS data and gave no weight to the GPS data." Dkt. 95-3 ("Durisek Affidavit") ¶ 10. Likewise, Durisek testified during his deposition that he calculated the speed of the Truck "in two different ways to get an understanding of how fast [Plaintiff] was driving at the time the vehicle was overturned." Durisek Dep. Tr. at 78:25-90:13; Durisek Speed Calculations at 3-4. Neither way involved reliance on GPS data.

Durisek explained that one method entailed calculating the "critical speed" of the Truck for the given environment:

> Q.   In your calculations under item six, vehicle critical speed, you have a conclusion on the end of that section, it says "a reasonable range for the tractor trailer combination to negotiate the curve was likely 41 to 51". Could you explain what you mean by that?
>
> A.   That is the speed range that a tractor trailer could have negotiated that radius before there it was overturn[ed].  So basically the critical speed is talking about the maximum speed that it could be tracked given the characteristics and the calculations.  So if they're going based on this analysis if you are looking at the larger weight shift and the lower friction range you could end up Mr. Bocoum could have overturned this vehicle in traveling 41 miles per hour, could have been going 42 miles per hour.  The weight shift was less than any tractor or larger radius.  He could have been going 51 miles per hour when it was overturned but really it is giving a speed range as to an upper boundary before the vehicle would have been overturned.

Durisek Dep. Tr. at 86:5-87:4; *accord* Durisek Speed Calculations at 3-4.

Under the second method, Durisek calculated the likely speed of Plaintiff's vehicle "at the time of the crash" based on physical evidence found at the scene, "working from the point of rest back to where the vehicle was overturned looking at average drag factors" and arriving at a range of "40 to 51 miles per hour."  Durisek Dep. Tr. at 90:4-13; *accord* Durisek Speed Calculations at 4.  Durisek further explained these calculations during his deposition:

> The way the equations work they really look at how an object generally speaking in this case it's a tractor and trailer how they move as a function of time and follows the laws of physics and the weight of that object actually gets cancelled out of those calculations.  So they're not used in determining the speed that the tractor was going so.
>
> And the critical speed analysis where I was looking at potential radius o[r] radii of curvature in coming up with the speed range going that way and then I also looked at . . . drag factors moving from rest going upstream to where the trailer was first overturned and looking at how the guardrail was deformed, how all the post of the guardrail were deformed, how the container hit the tree and how the tractor was interacting with the guardrail and how the tractor was deformed coming up with the range and drag factors represent all of that energy that was dissipated in that travel.

> When I did that analysis going from the point of rest to where we first have contact with the guardrail I determined the speed of 40 to 51 miles per hour which is -- which overlays nicely with the critical speed analysis that was done independently.

Durisek Dep. Tr. at 82:11-83:13.  At no point during his deposition did Durisek mention GPS data in explaining his method for calculating the speed and critical speed of the Truck prior to the Crash, and Durisek's calculations did not depend on the GPS data as one of the inputs in the equations. Thus, based the evidence in the record, the Court cannot find that Durisek's calculations rely in any way—materially or otherwise—on the GPS data or that any purported inaccuracies in or Durisek's reliance on the GPS data provide a basis to exclude his testimony as to the speed of the Truck prior to the Crash.

Plaintiff elides this point in his motion papers.  Instead, relying exclusively on GPS data, Plaintiff contends generally that "Durisek's opinion that plaintiff did not stop at the light, as well as his opinion that plaintiff was speeding and caused the truck to roll over, are the product of unreliable application of scientific methods and principles, are not supported by the facts in the record, and should be excluded."  Dkt. 88 at 14; Dkt. 109 at 8 ("In plaintiff's Memorandum in Support of the Motion, plaintiff pointed out that Durisek's speed calculations are *premised* on the assumption that the truck overturned because the truck attempted to negotiate the curve at too high a rate of speed. . . .  However, this assumption is very much in dispute – plaintiff claims that the truck only overturned after the steering failed and the truck struck the guardrail.").  Plaintiff, however, does not set forth any independent basis for challenging Durisek's calculations or his qualifications.  Moreover, to the extent Plaintiff seeks to argue that the assumptions underlying Durisek's calculations and his conclusions based on the calculations are inconsistent with other evidence in the record, "contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony."  *Zerega Ave. Realty Corp.*, 571 F.3d at 214 (internal quotation marks and citations omitted); *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1188 (2d Cir. 1992)

(refusing to strike expert testimony allegedly based upon unfounded assumptions; challenge to expert testimony "go[es] to the weight, not the admissibility, of the testimony"); *Aventis Env't Sci. USA LP v. Scotts Co.*, 383 F. Supp. 2d 488, 514 (S.D.N.Y. 2005) ("Defendants are free to challenge the basis and source for [the proposed expert]'s numbers, but a challenge to the facts or data relied upon by [the proposed expert] does not go to the admissibility of his testimony, but only to the weight of his testimony.").  As the Supreme Court in *Daubert* observed, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.  Accordingly, while Plaintiff is permitted to challenge the credibility of Durisek's opinion during Durisek's cross-examination at trial, the Court declines to exclude Durisek's testimony on the speed of the Truck prior to the Crash.

### b.    Durisek's Opinion Regarding the Fracture of the Steering Gear

Plaintiff also seeks to exclude Durisek's testimony that "[t]he physical evidence to the steering gear assembly components indicate higher than design loads were imparted to steering gear assembly in a forced left-turn motion," that the Steering Gear fractured due to "the higher than design loads that occurred during the overturn," and that he "identified no preexisting damage to the steering gear assembly components."  Durisek Report at 23.  Plaintiff contends that Durisek's testimony regarding the fracture of the Steering Gear should be excluded because (1) there is no evidence that the Truck generated gouges, abrasions, or markings of any kind in the roadway, (2) Durisek's opinions regarding the nature and cause of damage to the face of the Truck's front left wheel lack a factual basis, and (3) Durisek failed to demonstrate that the force imparted upon the Truck's wheel transmitted a load sufficient to cause the Steering Gear to fracture.  Dkt. 88 at 15-24.

As to Plaintiff's first two challenges, Plaintiff argues that there is lack of or insufficient evidence to support Durisek's finding that the Truck generated gouges, abrasions, or marking of any kind in the roadway because the two Massachusetts State Troopers, who are "the only witnesses who testified in this action that were present at and personally inspected the crash scene at a time on or about the incident," did not document any road marks in their reports that were attributable to the Truck as a result of or during the Crash. *Id.* at 15-16. Plaintiff also points out that Durisek never personally inspected any portion of the Truck and never spoke with anyone who personally inspected the Truck. *Id.* at 16-18, 20-21. In fact, Durisek's only observation of the physical evidence was limited to an in-person inspection of the Crash site nearly four years after the Crash, an inspection of the fractured Steering Gear, and contemporaneous photographs taken of the Crash site and the Truck. *Id.* at 17-18, 20. According to Plaintiff, this is significant because "Durisek's observation of the condition of the crash site several years after the incident has very limited probative value in establishing what the conditions at the crash site were at the time of the crash or soon thereafter," *id.* at 18, and the "photographs simply do not contain the information necessary for Durisek to render such a detailed conclusion through the application of reliable scientific methods and principles,"[11] *id.* at 21; *see also id.* at 18 ("Durisek does not contend that the manner in which he identified roadway marks and attributed them to plaintiff's crash follows any standard, methodology, or principle contained in the publications on which he purportedly relied in preparing his report, nor does Durisek indicate that those publications contain any such standard.").

---

[11] Plaintiff's expert, McElroy, however, testified during his deposition that he does not "take issue with the fact that Dr. Durisek performed a reconstruction based on the evidence that he had." McElroy Dep. Tr. at 65:1-4.

In sum, Plaintiff argues that Durisek's factual assumptions are insufficient because they are contradicted by other evidence in the record. But an expert's conclusions that are based upon facts and assumptions that are in dispute go to the weight, not admissibility, of the expert's testimony. *See Arista Recs. LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 422-23 (S.D.N.Y. 2009); *Blair v. Fairpoint Comm'cns, Inc.*, No. 14 Civ. 158 (WKS), 2016 WL 7799313, at *1 (D. Vt. Apr. 20, 2016) (holding that the expert's accident reconstruction analysis based upon evidence that the plaintiff drove straight across the intersection, as opposed to making a left turn, was admissible because the question of the plaintiff's direction "appears to be a fact in dispute, and not a matter of either speculation or conjecture on the part of the expert"). Moreover, "[t]he grounds for the expert's opinion merely have to be good, they do not have to be perfect." *Cedar Petrochems., Inc. v. Dongbu Hannong Chem. Co., Ltd.*, 769 F. Supp. 2d 269, 287 (S.D.N.Y. 2011) (internal quotation marks omitted). In other words, "[w]hile an expert should address evidence that contradicts his conclusions, it is not required that an expert categorically exclude each and every possible alternative cause in order to render the proffered testimony admissible." *Id.* (internal quotation marks omitted).[12] Thus, while Durisek may have benefited from examining

---

[12] The Court also is not persuaded that the evidence in the record is conclusive as to render Durisek's assumptions "unrealistic and contradictory so as to suggest bad faith or to be in essence an apples and oranges comparison." *Zerega Ave. Realty Corp.*, 571 F.3d at 214 (internal quotation marks omitted). For example, Trooper Tucker testified that his failure to record in his report any skid marks or yaw marks attributed to the Crash reflected that there were no marks to measure. Tucker Dep. Tr. at 50:14-51:11. But Trooper Tucker also was somewhat equivocal as to whether he could say definitively that there were no markings on the road near the Crash site. *See id.* at 50:14-18 ("Q. Okay. Did you find any markings in the road that you were able to attribute to this particular crash? A. I didn't write anything down and I don't remember so I'd have to say no."). Trooper Tucker also testified that the Crash was called in at 1:45 a.m. but that he was not advised of the crash until 7:00 a.m. *Id.* at 26:21-28:9. He explained that by the time he arrived at the site of the crash, "the vehicle had already been recovered so [he] wasn't able to examine the crash scene the way [he] should have and [he didn't] know what damage was done to the truck as it was being recovered. So [his] inspection was flawed from the start." *Id.* at 27:7-13. Moreover, Trooper Tucker testified that he "didn't do much at the scene," *id.* at 41:7-11, and his role in the crash investigation for the Truck "was just a technical side to take a look at the truck and see if

the Truck or visiting the Crash site in closer temporal proximity to the Crash, such criticism of his methodology and assumptions, including those used to perform the accident reconstruction, may be explored at trial. *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995) (finding that disputes as to faults in methodology go to the weight, not the admissibility, of expert testimony); *Hollman*, 928 F. Supp. 2d at 670 ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." (citation omitted)); *Cortland Racquet Club v. Oy Saunatec, Ltd.*, No. 96 Civ. 1671 (GBD), 2003 WL 1108740, at *4 (S.D.N.Y. Mar. 12, 2003) ("[I]t is not for this Court to preclude expert testimony simply because there is additional contradictory testimony that will be available to the jury."); *Blair*, 2016 WL 7799313, at *2 ("Whether [the expert's] methods survive cross-examination and/or contrary evidence will be a matter of weight, not admissibility."); *cf. Greenwell v. Boatwright*, 184 F.3d 492, 497 (6th Cir. 1999) ("Expert testimony is not inadmissible simply because it contradicts eyewitness testimony.").

In reaching this conclusion, the Court finds persuasive the court's reasoning in *Tedone v. H.J. Heinz Co.*, 686 F. Supp. 2d 300 (S.D.N.Y. 2009). In *Tedone*, the plaintiff brought suit in connection with an injury that resulted while opening a glass bottle of ketchup. During discovery, the plaintiff's expert was able to examine only three pieces of the original bottle because the remaining fragments had disappeared between the time of the plaintiff's injury and the

---

there was mechanical violations that might have contributed," *id.* at 33:1-6. Similarly, Trooper Welch testified that he did not recall whether he observed any skid marks on the roadway at the scene of the crash. Welch Dep. Tr. at 76:15-77:2 ("Q. At the scene of the crash, did you see any skid marks on the roadway? A. I don't recall, sir. Q. If you had, isn't that something that you could have put into your diagram? A. Yes, sir. Q. So you chose not to do that, when you did this diagram? A. I said I do not recall, sir. Q. Yeah. But you would have recalled when you made the diagram, right? A. Possibly.").

commencement of litigation.  *Id.* at 305.  The defendant's expert similarly was unable to examine the subject bottle, but reviewed the plaintiff's photographs of the bottle taken at the time of the injury as well as the descriptions of the bottle in the plaintiff's expert's report and deposition.  *Id.* at 306.  At the summary judgment stage, each party moved to exclude the other side's expert testimony.  *Id.* at 308.

The defendant moved to exclude on the ground that the plaintiff's expert "d[id] not base his opinion on sufficient facts, fail[ed] to use reliable methods, and d[id] not apply principles to the case facts" because the expert "undertook only a 'single examination of incomplete sections of the bottle'" and "reached his conclusions based on 'totally erroneous' assumptions that directly contradict generally recognized principles," among other things.  *Id.* at 309.  The court disagreed, finding that the defendant's attacks on the expert's testimony "go to its weight, not admissibility."  *Id.* at 310.  In particular, the court observed that the plaintiff's expert "examined all the pieces of the bottle" that had been retained, taking "dimensional measurements, examin[ing] for nicks and bubbles, analyz[ing] the ridges along the break lines, and fitt[ing] the pieces together" before rendering a conclusion as to the cause of the fracture.  *Id.*  As to the defendant's argument that the plaintiff's expert's "methods and conclusions are wholly inconsistent with generally recognized principals [*sic*]," the court found that there was an insufficient basis to exclude the testimony because the defendant failed to cite to "any authority—legal or scientific—to support this contention" and "simply repeat[ed] that [the plaintiff's expert]'s statements are 'not true.'"  *Id.*

The plaintiff in *Tedone* moved to exclude the testimony of the defendant's expert on the basis that the expert did not personally examine any fragments of the subject bottle.  *Id.*  Here too, the court found that the plaintiff's "challenge to the expert's testimony is more properly directed to its weight not its admissibility."  *Id.* at 311.  The court reasoned that although the defendant's expert could not examine the specific pieces of glass, he did examine the contemporaneous

photographs taken at the time of the plaintiff's injury, and this photographic analysis, "coupled with [the expert]'s knowledge of the general bottle manufacturing process, . . . and incorporation of the Plaintiff's own testimony as to the circumstances of the break provides adequate factual support to allow his testimony to pass through the 'gate' and come before the fact finder." *Id.*

Similarly, Durisek, through what appears to be no fault of his own,[13] did not have an opportunity to inspect the Truck. Durisek did, however, consider other available evidence, including photographs of the Crash site and of the Truck taken shortly after the Crash. Durisek also personally visited the Crash site to examine and measure the road. Therefore, while Plaintiff may challenge Durisek's factual findings and the sufficiency of those findings during cross-examination at trial, they are not an appropriate basis to exclude Durisek's testimony.

The Court also will permit testimony from Durisek as to whether the force imparted upon the Truck's wheel transmitted a load sufficient to cause the Steering Gear to fracture. In his report, Durisek opined on the potential cause of the fracture of the Truck's Steering Gear based on his examination of the device:

> The worm screw was fractured at its end nearest the input shaft as shown in Figure 14. The fracture surfaces appeared uniform and were absent of post-fracture contact marks. No beach marks or signs of fatigue fracture were observed. . . . The helix bearing race exhibited deformation from high-force contact with the steel balls, or brinelling, on the side of the helix furthest from the input shaft. These marks were from significant axial impact forces applied to the worm screw in the direction away from the input shaft and valve housing (Figure 13, No. 10). . . . The impact load marks are consistent with the worm screw being put in tension. . . . I did not observe wear on the edges of the indentations on the worm screw or in the

---

[13] It appears that Pionna disposed of the Truck before Plaintiff commenced litigation against Defendants. In opposing Plaintiff's motion to exclude testimony from Durisek, Defendants argue that "Pionna Transport LLC, plaintiff's employer, **disposed of the vehicle** long before plaintiff sued DTNA and ZF ASE." Dkt. 95 at 15 (citing Dkt. 95-14 at 53:9-54:23 (excerpt of Gonzalez deposition transcript)). In his deposition, Gonzalez stated that at some point after an inspection, Pionna disposed of the Truck. Dkt. 95-14 at 54:6-23. In his reply in further support of the motion to exclude Durisek's testimony, Plaintiff does not dispute that Pionna disposed of the Truck prior to the commencement of this litigation. *See generally* Dkt. 109.

rack piston that would be consistent with the balls passing over the indentations repeatedly during use. . . .  The physical evidence to the steering gear components indicate that higher than design loads were imparted to the steering gear assembly during the crash sequence.

Durisek Report at 14-16.  In his motion, Plaintiff does not take issue with Durisek's observations of the Steering Gear or Durisek's qualifications to render such observations.  Instead, Plaintiff faults Durisek for failing to provide a "meaningful quantification of the force exerted upon the face of the wheel" and to articulate an "opinion with respect to what load actually was exerted on the steering components, or in what manner that load was sufficient to cause the gear to fracture." Dkt. 88 at 23-24.

As with the approach employed by Plaintiff's own expert, McElroy, Durisek's report demonstrates that his opinion regarding the fracture of the Steering Gear is based on his examination of the physical evidence and is limited to that examination.  While a quantification of the load capacity and likely load that was exerted on the Steering Gear during or as a result of the Crash may be helpful to Plaintiff, Durisek does not purport to opine on this issue.  Indeed, Durisek testified during his deposition that, "looking at the physical evidence at the scene, looking at the physical evidence on the vehicle, looking at the physical evidence within the steering gear itself, looking at what ever other data would be available," he "determined that the steering gear worm screw was fractured as a result of the rollover after the vehicle was overturned in this crash." Durisek Dep. Tr. at 26:4-12; *see also id.* at 119:21-120:12 (testifying that if the Steering Gear was fractured before the crash, there would be different physical evidence).  Moreover, the Court disagrees with Plaintiff's suggestion that Durisek's opinions regarding the fracture of the Steering Gear is contingent on any numerical calculation of the force such that his failure to offer a "meaningful quantification of the force exerted upon the face of the wheel" renders his conclusions

"speculative[] and baseless[]."   Dkt. 88 at 23.   Accordingly, the Court declines to exclude Durisek's testimony regarding the fracture of the Steering Gear.

*     *     *

For the reasons stated above, Plaintiff's motion to exclude Durisek's expert testimony is denied in its entirety.

### 2.    Timothy Cheek

Timothy Cheek is an engineer with approximately thirty years of experience providing forensic engineering services to the transportation industry.  *See* Cheek Report at 14-15.  He holds Bachelor of Science and Master of Science degrees in Materials Science and Engineering from the University of Florida.   *Id.* at 14.   Since 2005, he has been employed at DELTA |V| Forensic Engineering, Inc., where he has "reconstructed motor vehicle crashes and evaluated vehicle systems in matters involving crashes."   *Id.* at 2, 14.   Cheek previously was employed at International Truck and Engine Corporation, where he worked on accident investigations, component failure analysis, materials engineering and testing, materials specifications, and product development. *Id.* at 15.  Cheek holds Professional Engineering licenses in multiple states and is a member of the Alpha Sigma Mu Honorary Society (Materials Engineering), the American Society of Materials – International, and the Society of Automotive Engineers.   *Id.* at 14, 18. Throughout his career, Cheek has performed thousands of crash reconstructions and numerous failure analyses involving steering gears and steering systems.  *Id.* at 1-2; Dkt. 85-6 ("Cheek Dep. Tr.") at 22:5-8.

Defendants retained Cheek to testify in the areas of "materials/metallurgical engineering and analysis; component failure analysis; design and manufacture of heavy truck steering components; inspection procedures for and warnings related to steering gears; his inspection of the . . . steering gear; relevant scientific literature; other subjects within his fields of expertise; and

40

analysis and any necessary rebuttal of Plaintiff's experts' opinions and conclusions."  Defendants'

Expert Disclosures at 2-3.  In his report, Cheek has proffered five expert opinions in connection

with his anticipated testimony in this action:

1. The post-crash condition of the truck-tractor exhibited damage and marks consistent with rollover and sliding on the left side.  Damage was present on the left steer tire and wheel.  [("Cheek's Opinion 1")]

2. Damage to the steering gear components was consistent with impact loading transmitted through the steering linkage into the steering gear.  [("Cheek's Opinion 2")]

3. The impact loading to the steering gear was consistent with the external damage observed to the truck-tractor.  [("Cheek's Opinion 3")]

4. Fracture of the internal Worm of the steering gear was from an overload force and not from a progressive crack growth that occurred over time.  [("Cheek's Opinion 4")]

5. Instructions provided by Freightliner/DTNA and TRW in their operator and service manuals were reasonable and typical for the industry.  Furthermore, an instruction (as suggested by Robert McElroy) to regularly and periodically perform magnetic particle inspection on the internal components of the steering gear would be impractical in general and would have been unnecessary given that there was no evidence to indicate that the internal damage to the steering gear pre-existed this crash.  [("Cheek's Opinion 5")]

Cheek Report at 7.  Cheek represented that he rendered these opinions based on his education,

training, and experience; a review of relevant literature and testing; the testimony of certain fact

and expert witnesses; a review of relevant documents, materials, and photographs; and his

inspection of the Steering Gear.  *Id.* at 6.  Plaintiff moved to exclude Cheek's proffered testimony

in its entirety.

Before turning to Plaintiff's specific challenges to Cheek's opinions, the Court first

addresses Plaintiff's overarching argument that the Court should preclude Cheek from testifying

at trial because, "[a]lthough Cheek claimed that he did not directly rely upon Durisek's findings

in preparing his own report, it is obvious that, in reality, Cheek entirely premised his own opinions

on the assumption that the crash happened in the manner claimed in Durisek's reconstruction."
Dkt. 89 at 9-10; *id.* at 11-12 (arguing that Cheek's opinions should be excluded because they are
"[w]holly [p]remised" on Durisek's reconstruction, "which is [u]nsound and [u]nreliable").
Plaintiff fails to cite to any evidence in the record to support this assertion and the Court is not
convinced that "it is obvious that . . . Cheek entirely premised his own opinions" on Durisek's
findings. *Id.* at 9-10. Under the section on "file materials reviewed" in his expert report, Cheek
listed the depositions of certain witnesses, including defense expert, Noah. Cheek Report at 2.
Noticeably missing from this list and in the rest of Cheek's report is any mention of Durisek's
deposition, his report, or any of his findings. This observation is further buttressed by Cheek's
deposition testimony. When asked whether he relied on any of Durisek's findings in reaching his
conclusion, Cheek testified that, while he found that Durisek's "findings were consistent with [his]
own observations," Durisek's findings were not necessary for reaching his own conclusions.
Cheek Dep. Tr. at 25:10-15. Cheek also testified that he "did [his] own independent review of
th[e] materials and the evidence prior to constructing [his] report, so [Durisek's] report was not
necessary to construct [his] report." *Id.* at 25:19-26:2.

But even if Cheek had relied in any way on Durisek's findings, "[e]xpert witnesses are
entitled to rely on facts, opinions and data developed or prepared by another," *In re M/V MSC
Flaminia*, No. 12 Civ. 8892 (KBF), 2017 WL 3208598, at *5 n.6 (S.D.N.Y. July 28, 2017) (citing
*U.S. Bank Nat'l Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 131 (S.D.N.Y. 2015));
*Faulkner v. Arista Recs. LLC*, 46 F. Supp. 3d 365, 385 (S.D.N.Y. 2014) ("[A]n expert may rely on
assistants or the opinions of other experts in formulating their own expert opinions."), so long as
the expert in the end gives his or her own opinion instead of "simply aggregat[ing] or recit[ing]
the opinions of others," *In re M/V MSC Flaminia*, 2017 WL 3208598, at *2. *See Malletier v.
Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 664 (S.D.N.Y. 2007) ("It is true that experts are

permitted to rely on opinions of other experts to the extent that they are of the type that would be reasonably relied upon by other experts in the field.  But in doing so, . . . [h]e cannot simply be a conduit for the opinion of an unproduced expert." (citation omitted)).  As discussed below, Cheek has not merely aggregated or recited Durisek's findings but, rather, has made independent findings based on his own analysis.  Moreover, the Court has already found that Durisek's testimony is admissible under Rule 702 and *Daubert*.  As such, the Court declines to exclude Cheek's testimony on that basis.

### a.    Cheek's Opinions 1-4

Turning to Plaintiff's specific objections, Plaintiff contends that Cheek's Opinions 1, 2, and 3 should be excluded because "Cheek did not conduct an accident reconstruction, did not inspect the vehicle, and offers vague opinions that damage to the vehicle is 'consistent with' Durisek's version of events" without offering any "basis for the opinion," "analysis," or "scientific methodology."  Dkt. 89 at 6.  Plaintiff contends that Cheek's Opinion 4 also should be excluded because, although Opinion 4 "is arguably within his expertise and analysis in this case," "a review of [Cheek's] expert testimony reveals a failure to follow the scientific methodology he himself outlined."  *Id.*

The Court finds that Cheek is qualified based on his education and experience to render Cheek's Opinions 1, 2, 3, and 4.  As stated above, Cheek holds undergraduate and graduate degrees in Materials Science and Engineering, and has approximately thirty years of experience providing forensic engineering services to the transportation industry.  *See* Cheek Report at 14-15.  During his prior employment at International Truck and Engine Corporation, Cheek worked on accident investigations, component failure analysis, materials engineering and testing, materials specifications, and product development.  *Id.* at 15.  He also has performed numerous failure analyses involving steering gears and steering systems, *id.* at 1-2, and thousands of crash

43

reconstructions, Cheek Dep. Tr. at 22:5-8, over the course of his career.  Plaintiff argues that Cheek "is not [q]ualified to . . . render an [o]pinion about the [s]equence of [e]vents leading up to the Crash" because "his analysis related strictly to the reaction and interaction of the internal components of the steering gear, and are premised on the assumption that the crash occurred as claimed by defendants' accident reconstructionist, Nicholas Durisek."  Dkt. 89 at 6-7.  While couched as a challenge to Cheek's qualifications, Plaintiff's argument, which is addressed below, actually attacks the reliability of Cheek's methodology.  Indeed, Plaintiff does not dispute Cheek's qualifications to conduct a failure analysis or to opine on the post-Crash condition of the Truck (Cheek's Opinion 1) or the cause of the damage to the Steering Gear components (Cheek's Opinions 2, 3, and 4).  Accordingly, Cheek is qualified to render Opinions 1, 2, 3, and 4.

The Court also finds that Cheek's Opinions 1, 2, 3, and 4 are reliable.  In arriving at these opinions, Cheek conducted a failure analysis to determine the cause of the damage to the Truck and the Steering Gear.  *See Fulford v. Climbtek, Inc.*, No. 16 Civ. 16 (BAJ) (EWD), 2020 WL 403539, at *2 (M.D. La. Jan. 24, 2020) ("Failure analysis involves an evaluation of the components of a product that are either not functioning or have failed to determine the mode of failure and the factors that contributed to the failure."); *Meneely v. Denman Tire Corp.*, No. GCA 93-10151 (MMP), 1995 WL 902213, at *4 (N.D. Fla. July 20, 1995) (noting that "failure analysis . . . involves the study, from an engineering standpoint, as to why products fail" (internal quotation marks omitted)).  In conducting the failure analysis, Cheek relied on his education, work experience, training, and reference guides, including the American Society of Metals Handbook. Cheek Report at 2, 14-16; *see* Cheek Dep. Tr. at 25:16-26:1.  The American Society of Metals Handbook is multi-volume handbook that is "a widely-used reference in the industry."  Cheek Dep. Tr. at 29:13-14.  One of the volumes pertains to "Failure Analysis and Prevention" and provides, as relevant for purposes of Plaintiff's motion, that "[t]he principal task of a failure analyst

during a physical cause investigation is to identify the sequence of events involved in the failure," which includes: (1) "[c]ollect[ing] data," (2) "[i]dentify[ing] damage modes present," (3) "[i]dentify[ing] possible damage mechanisms," (4) "[t]est[ing] to identify actual mechanisms that occurred," (5) "[i]dentify[ing] which mechanism is primary and which is/are secondary," (6) "[i]dentify[ing] possible root causes," (7) "[t]est[ing] to determine actual root cause," and (8) "[e]valuat[ing] and implement[ing] corrective action." Dkt. 87, Exh. 14 at 1.

Plaintiff's primary criticism of Cheek's failure analysis is that instead of "set[ting] out to determine the 'sequence of events' leading up to the crash," Cheek's "analysis related strictly to the reaction and interaction of the internal components of the steering gear." Dkt. 89 at 6. This does not provide a sufficient basis to exclude Cheek's testimony. As a preliminary matter, Plaintiff does not contend that a failure analysis, itself, is an unreliable methodology or that any purported failure by Cheek to determine the sequence of events leading up to the crash undermined, or affected in any way, the results of his failure analysis. *See In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009) ("[I]n accordance with the liberal admissibility standards of the Federal Rules of Evidence, only serious flaws in reasoning or methodology will warrant exclusion." (citing *Amorgianos*, 303 F.3d at 267)); *accord AU New Haven, LLC v. YKK Corp.*, No. 15 Civ. 3411 (GHW) (SN), 2019 WL 1254763, at *14 (S.D.N.Y. Mar. 19, 2019) (holding that "any deviations or errors" in the methodology go to the weight, and not admissibility, of the evidence); *Newport Corp. v Lighthouse Photonics Inc.*, No. 12 Civ. 719 (DOC), 2014 WL 1370749, at *3 (C.D. Cal. Apr. 8, 2014) ("Failure to perfectly adhere to methodologies promulgated by a standard-setting organization is not, by itself, grounds for precluding expert testimony.").

Moreover, Plaintiff's contention is contradicted by both Cheek's deposition testimony and his report. During his deposition, Cheek described the process that he undertook to identify the

"sequence of events" leading up to the Crash.  Cheek Dep. Tr. at 30:4-34:25.  Likewise, in his report, Cheek analyzed Plaintiff's statement and deposition testimony, as well as the photographs and the Steering Gear, to identify the sequence of events.  Cheek Report at 3-6.  While defense counsel objected to a question by Plaintiff's counsel during Cheek's deposition regarding the sequence of events, defense counsel objected "to the extent it is outside of [Cheek's] expertise" but permitted Cheek to "go ahead and answer."  Cheek Dep. Tr. at 31:17-19.  Defense counsel explained that Plaintiff's counsel is "deposing an accident reconstruction expert next week who will tell you the details of the sequence of events."  *Id.* at 31:24-32:4.  The Court does not read defense counsel's statement to suggest, let alone "ma[k]e clear," that "Cheek was not qualified to opine on the sequence of events leading up to the crash."  Dkt. 89 at 7.

Lastly, the Court finds that Cheek's testimony as to Opinions 1, 2, 3, and 4 are relevant and "will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.  Plaintiff does not contest the relevance of Cheek's testimony or argue that it should be excluded on any other grounds.  As such, the Court declines to preclude Cheek from offering testimony as to his Opinions 1, 2, 3, and 4.

> **b.    Cheek's Opinion 5[14]**

As to Cheek's remaining opinion—Cheek's Opinion 5—Plaintiff seeks to exclude Cheek's testimony on the ground that Opinion 5 "presents a conclusory statement which has no basis in the record and no scientific principles or methodology."  Dkt. 89 at 6.  The Court agrees and also finds that Opinion 5 is not admissible because Cheek is not qualified to testify as to the sufficiency or

---

[14] Plaintiff refers to an "opinion number 6" in his motion to exclude Cheek's testimony. *See* Dkt. 89 at 6.  Because Cheek proffers five ultimate conclusions in his report and Plaintiff has already moved to exclude the other four opinions, the Court construes Plaintiff's argument regarding "opinion 6" as seeking to exclude Cheek's Opinion 5.

reasonableness of Defendants' service manuals.   As a general matter, an engineer expert's testimony may rest on "the personal knowledge or experience of the engineer."   *Colon ex rel. Molina*, 199 F. Supp. 2d at 69-70.   But such opinion still "requires *some explanation* as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion." *Riegel*, 451 F.3d at 127 (emphasis added).   Here, it is undisputed that Cheek is a professional engineer with more than thirty years of experience.   But Defendants have not demonstrated how Cheek is qualified to testify as an expert on services manuals.   Cheek does not contend that he is qualified through his education, training, or work experience, and even under the most generous reading of Cheek's report, *curriculum vitae*, and his deposition testimony, the Court is unable to conclude that Cheek is qualified to testify about service manuals or warnings related to steering gears.   And even if Defendants could demonstrate that Cheek is qualified to opine on service manuals or warnings, Cheek has not demonstrated that he employed any reliable methodology in reaching Opinion 5.   Instead, Defendants in their opposition to Plaintiff's motion to exclude Cheek's testimony make a passing reference to Cheek's "review of defendants' service manuals in comparison to other manufacturers' manuals."   Dkt. 94 at 9.   But Defendants do not explain what other manufacturers' manuals Cheek reviewed, or what specialized training or knowledge Cheek applied in rendering Opinion 5 that would justify permitting him to testify as an expert on service manuals or warnings.   *See Lidle ex rel. Lidle v. Cirrus Design Corp.*, No. 08 Civ. 1253 (BSJ) (HBP), 2010 WL 2674584, at *4 (S.D.N.Y. July 6, 2010) ("[E]xpert testimony should not merely reiterate arguments based on inferences that can be drawn by laypersons; those can properly be advanced by the parties in their summations." (citation omitted)).

*       *       *

For the reasons stated above, Plaintiff's motion to exclude expert testimony from Cheek is granted in part and denied in part.  Cheek may testify at trial as to his Opinions 1, 2, 3, and 4, but he may not testify as to his Opinion 5.

### 3.     Bruce Noah

Bruce Noah holds a Bachelor of Science degree in Mechanical Engineering Technology from Purdue University.  Noah Report at 15.  From 1976 to his retirement in 2020, Noah was employed by ZF ASE, most recently working as a Technical Specialist in the Product Application Engineering group from May 1995 to December 2019.  *Id.* at 1, 15.  In this role, Noah "[c]onducted evaluations of ZF-TRW steering system components involved in motor vehicle accidents and provided opinions and conclusions on [the] condition of the parts prior to the accident," "[c]onducted complete steering system design analysis for customers and provided technical direction to enhance performance or to resolve problems for both new and existing truck models," "[p]rovided technical direction to internal ZF-TRW product design engineering groups for new designs or design changes to ZF-TRW components and systems," and "[d]rafted technical documents including specifications . . . and service bulletins."  *Id.* at 15.  Most notably, while employed at ZF ASE, Noah worked with DTNA "to develop the THP60010 steering gear design and its associated system components for the Freightliner P2 chassis on the subject vehicle."  Dkt. 102-3 ("Noah Declaration") ¶ 2.  Defendants retained Noah as an expert to "testify in the areas of design, manufacture, maintenance, inspection, testing, and analysis of heavy truck steering components; the performance of the subject steering gear; inspection procedures for and warnings related to steering gears; his inspection of the subject vehicle and steering gear; heavy truck steering component failure analysis; and analysis and any necessary rebuttal of Plaintiff's experts' opinions and conclusions."  Defendants' Expert Disclosures at 3-4.

Based on his "inspections, background, training, experience, and knowledge of the THP60010 steering gear and the Freightliner Columbia tractor," Noah proffered seven expert opinions in this action:

1. The subject THP60010 steering gear was intact and capable of transmitting torque from the steering wheel to the front tires at the time of the subject crash. [("Noah's Opinion 1")]

2. The subject 2007 Freightliner Columbia was involved in a rollover accident that resulted in the left front wheel striking a solid object which forced the front wheels to turn farther left, inducing a clockwise impact load into the steering gear. The impact load in the subject crash resulted in the Brinell marks seen on both the worm shaft and the sector shaft, the fracture of the worm, and the torsional cracks in the sector shaft. [("Noah's Opinion 2")]

3. The design of the worm shaft is more than acceptable with a safety factor of 6.3X at an input load of 3,600 inch-pounds. [("Noah's Opinion 3")]

4. If the gear was damaged at the time of the two earlier accidents recorded by Carfax, magnetic particle inspection of the worm shaft would not have been necessary to determine whether the gear was damaged and in need of replacement. [("Noah's Opinion 4")]

5. The steering gear on the subject vehicle functioned properly for over one million miles without any reported problems or issues and was functioning properly at the time of the crash. [("Noah's Opinion 5")]

6. The steering gear met ZF ASE's internal specifications and requirements and DTNA's specifications and requirements and was neither defective nor unreasonably dangerous. [("Noah's Opinion 6")]

7. There were no design, manufacturing, or marketing/warning defects in the subject gear. [("Noah's Opinion 7")]

Noah Report at 14. Plaintiff moved to exclude Cheek's testimony in its entirety. According to Plaintiff, Noah's Opinions 2, 4, and 5 are "admittedly beyond his expertise and merely reiterations of Durisek's conclusions"; "Noah's [O]pinions 1 and 7 are also beyond his expertise and beyond his review and analysis of the case"; Opinion 3 "addresses the design" and "[s]ince there is no design claim, the opinion is irrelevant, unnecessary, and will not assist the trier of facts"; and

Opinion 6 is not admissible because Noah "provides no basis to offer the opinion as it may relate to the condition of the steering gear just prior to the crash." Dkt. 90 at 7.

### a.    Noah's Opinions 1, 2, and 4

Noah's Opinions 1, 2, and 4 are admissible expert testimony. Plaintiff contends that these opinions are improper because they are within the purview of accident reconstruction, on which Noah is not an expert, and outside the scope of his personal knowledge. Dkt. 90 at 7-12. But Plaintiff fails to specify which of Noah's proffered opinions relate to accident reconstruction. As Defendants point out in their opposition, "Noah's work in this lawsuit focuses on a failure analysis of the subject steering gear and the design and performance of the gear." Dkt. 102 at 2. In fact, Plaintiff acknowledged in his motion to exclude Noah's testimony that Noah "repeatedly deferred to the opinions of Durisek when asked questions he believed touched on accident reconstruction." Dkt. 90 at 13. Thus, the Court does not construe Noah's proffered opinions to constitute opinions on a reconstruction of the Crash.

Moreover, the Court finds that Noah is qualified to testify as to his Opinions 1, 2, and 4. For nearly twenty-five years, Noah worked as a Technical Specialist in the Application Engineering group at ZF ASE, where he worked on ZF ASE's products related to commercial steering for trucks. Noah Dep. Tr. at 14:7-16. According to Noah, this position "requires broad experience and in-depth knowledge of the performance, durability, and reliability requirements for all ZF ASE component designs as well as heavy truck steering designs." Noah Declaration ¶ 2. In this role, he worked with DTNA "to develop the THP60010 steering gear design and its associated system components," *id.* ¶ 2, and "[c]onducted evaluations of ZF-TRW steering system components involved in motor vehicle accidents and provided opinions and conclusions on [the] condition of the parts prior to the accident," Noah Report at 15. Noah also has declared under penalty of perjury that he "evaluated the steering systems in numerous truck accidents during [his]

employment at ZF ASE between 2012 and 2020," including "disassembly and analysis of the

steering gear," and that his "experience from those evaluations is one of the bases for many of [his]

conclusions and opinions in this case."  Noah Declaration ¶ 7.

Second, Noah's Opinions 1, 2, and 4 are reliable.  Noah explained in his report that he

conducted an inspection of the Truck.  During his inspection of the exterior of the Truck, Noah

noted that he observed "impact damage to the left front wheel and lug nut at approximately one

o'clock and to the rim of the wheel at approximately two o'clock," which indicate that "the left

front wheel struck a solid object."  Noah Report at 6.  Noah also conducted an inspection of the

Steering Gear, which "was removed from the truck for disassembly and inspection of the internal

components."  *Id.* at 8.  During his inspection of the Steering Gear, Noah observed "impact

overload," "torsional overload induced cracks . . . in the undercut between the splines and the

trunnion surface" that show that "the impact load was applied in a clockwise direction," and

"Brinell marks . . . in the trunnion surface from an impact against the output shaft bearing," which

are "consistent with a tension/torsion overload of the worm shaft material."  *Id.* at 8-9.  Noah also

reviewed relevant case materials, including deposition transcripts, photographs, expert reports, and

the pleadings in this action.  *Id.* at 2.  Based on his consideration of the evidence, Noah concluded

that:

> [T]he Brinell marks on the worm shaft and sector shaft, the torsion cracks in the
> sector, and the fracture of the worm shaft are all evidence of an impact overload.  I
> have seen the same type of overload damage in new THP60 gears following
> laboratory tests to determine the ultimate impact strength of the gear.  During my
> investigations of other vehicle crashes, I have also seen virtually identical fractures
> of the worm shaft, including some in rollover crashes caused by high winds where
> there was no complaint of steering loss by the driver or in rollover crashes with
> admitted driver inattention. . . .  In Figures 2 and 3 above, there is evidence that the
> left front wheel and tire impacted a solid object with enough force to damage the
> steel rim.  Further, we can see in the photos that the tires were in a full left turn after
> the truck came to rest at the accident scene.  In the Freightliner Columbia
> application, the THP60010 output shaft rotates clockwise to make a left turn.  The

fracture of the worm shaft and torsion cracks noted on the sector shaft both resulted
from an impact load that forced the steering gear output shaft to rotate clockwise.

*Id.* at 11.

In response, Plaintiff argues that these opinions should be excluded because they are
"wholly premised" on Durisek's reconstruction.  Dkt. 90 at 12-16.  Plaintiff does not cite to any
evidence in the record to support his assertion, but rather, observes that "the version of the crash
put forth by Noah is substantially the same [as] it is described in Durisek's report"—which,
according to Plaintiff "is in complete contradiction with the evidence on the record"—and "Noah
was aware of Durisek's testimony at the time of his deposition."  *Id.* at 12-13.  This is insufficient
to support a finding that Noah's opinions are wholly premised on Durisek's reconstruction.
Furthermore, even if it were the case that Noah had relied on Durisek's findings, as discussed
above, "[e]xpert witnesses are entitled to rely on facts, opinions and data developed or prepared
by another" so long as the expert in the end gives his own opinion instead of "simply aggregat[ing]
or recit[ing] the opinions of others."  *In re M/V MSC Flaminia*, 2017 WL 3208598, at *2.  Here,
the Court finds that Noah has made independent findings based on his own analysis.

Third, the Court finds that Noah's Opinions 1, 2, and 4 are relevant and will help the jury
in understanding the potential causes of the fracture of the worm screw in the Steering Gear.

**b.    Noah's Opinion 3**

In Noah's Opinion 3, Noah stated that "[t]he design of the worm shaft is more than
acceptable with a safety factor of 6.3X at an input load of 3,600 inch-pounds."  Noah Report at 14.
Plaintiff seeks to exclude Noah's Opinion 3 on the basis that it "addresses the design" of the
Steering Gear and because "there is no design claim, the opinion is irrelevant, unnecessary, and
will not assist the trier of facts."  Dkt. 90 at 7.  Because Plaintiff does not advance a design claim
on summary judgment and in fact expressly disclaims any such claim, *see id.*, the Court excludes

Noah's Opinion 3.  *See Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." (internal quotation marks omitted)).

### c. Noah's Opinions 5 and 7

In Noah's Opinion 5, Noah concluded that the Steering Gear "functioned properly for over one million miles" and "was functioning properly at the time of the crash," and in Noah's Opinion 7, he concluded that "[t]here were no design, manufacturing, or marketing/warning defects in the" Steering Gear.  Noah Report at 14.  The Court excludes these two opinions as improper legal conclusions.  Expert testimony must not "usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999) (internal quotation marks and citations omitted).  While an expert "may opine on an issue of fact within the jury's province," an expert "may not give testimony stating ultimate legal conclusions based on those facts."  *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991); *Densberger v. United Techs. Corp.*, 297 F.3d 66, 74 (2d Cir. 2002) ("It is a well-established rule in this Circuit that experts are not permitted to present testimony in the form of legal conclusions." (citation omitted)); *Celebrity Cruises Inc.*, 434 F. Supp. 2d at 191 ("Expert testimony that merely states a legal conclusion must be excluded.").

### d. Noah's Opinion 6

Noah may testify as to the portion of Noah's Opinion 6 that concluded that "[t]he steering gear met ZF ASE's internal specifications and requirements and DTNA's specifications and requirements."  Noah Report at 14.  Noah is qualified to render this opinion because he "worked with [DTNA] to develop the THP60010 steering gear design and its associated system components for the Freightliner P2 chassis on the subject vehicle."  Noah Declaration ¶ 2; Noah Dep. Tr. at 22:4-21 (testifying that at the time ZS ASE was developing the design for the THP60010 steering gear, he was "working application engineering, working directly with the chassis engineering

group at Freightliner . . . to develop this particular part number for use in their P2 chassis").  Noah, however, may not testify that the Steering Gear "was neither defective nor unreasonably dangerous," which constitutes a legal conclusion that is improper for expert testimony.  *See Densberger*, 297 F.3d at 74; *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 547 (excluding expert's opinion that the conduct potentially constituted "negligence" or "something more serious" because "it impermissibly embraces a legal conclusion").

*     *     *

For the reasons discussed above, Plaintiff's motion to exclude Noah's expert testimony is granted in part and denied in part.  Noah may testify at trial as an expert as to Noah's Opinions 1, 2, and 4, but may not testify as to Noah's Opinions 3, 5, and 7.  As to Noah's Opinion 6, Noah may testify as to his opinion that "[t]he steering gear met ZF ASE's internal specifications and requirements and DTNA's specifications and requirements," but he may not opine that the Steering Gear "was neither defective nor unreasonably dangerous."

### III.    Summary Judgment

#### A.    Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine dispute exists where 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' while a fact is material if it 'might affect the outcome of the suit under the governing law.'"  *Chen v. 2425 Broadway Chao Rest., LLC*, No. 16 Civ. 5735 (GHW), 2019 WL 1244291, at *4 (S.D.N.Y. Mar. 18, 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The Court must "resolve all ambiguities and draw all justifiable factual inferences in favor of the party against whom summary judgment is sought."  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).

"The movant bears the initial burden of demonstrating 'the absence of a genuine issue of material fact,' and, if satisfied, the burden then shifts to the non-movant to present 'evidence sufficient to satisfy every element of the claim.'"  *Chen*, 2019 WL 1244291, at *4 (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008)).  The non-movant "may not rely on conclusory allegations or unsubstantiated speculation" and "must offer some hard evidence showing that its version of the events is not wholly fanciful." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (internal quotation marks and citations omitted).  The non-movant must present more than a "scintilla of evidence." *Anderson*, 477 U.S. at 252.  "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (internal quotation marks and citation omitted).

## B.    New York Products Liability Law

The Amended Complaint alleges claims against Defendants for Plaintiff's injuries resulting from the Crash under theories of negligence, strict liability, and breach of warranty based on alleged manufacturing defects, design defects, and for failure to provide adequate warnings.  Am. Compl. ¶¶ 34-54.  Because both sides direct their briefing to New York law and "agree to apply New York law to their dispute," Dkt. 112 at 1, the Court applies New York law to Plaintiff's claims.  *See Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) ("The parties' briefs assume that New York law controls, and such 'implied consent . . . is sufficient to establish choice of law.'" (citation omitted)); *Keles v. Yale Univ.*, 889 F. Supp. 729, 733 (S.D.N.Y. 1995) ("Where the parties fail to raise the issue of choice of law, the Court need not raise the issue *sua*

*sponte*, and the parties are deemed to have acquiesced in the application of the law of the forum."), *aff'd*, 101 F.3d 108 (2d Cir. 1996).[15]

To state a claim for negligence against a manufacturer under New York law, a plaintiff must show "(1) that the manufacturer owed plaintiff a duty to exercise reasonable care; (2) a breach of that duty by failure to use reasonable care so that a product is rendered defective, *i.e.*, reasonably certain to be dangerous; (3) that the defect was the proximate cause of the plaintiff's injury; and (4) loss or damage." *Colon ex rel. Molina*, 199 F. Supp. 2d at 82 (citing *McCarthy v. Olin Corp.*, 119 F.3d 148, 156 (2d Cir. 1997); then *Cacciola v. Selco Balers, Inc.*, 127 F. Supp. 2d 175, 185 (E.D.N.Y. 2001)). To state a claim under a theory of strict liability, a plaintiff must show that "(1) a defective product (2) caused plaintiff's injury." *Id.*; *see also Amatulli v. Delhi Const. Corp.*, 77 N.Y.2d 525, 532 (1991) ("A manufacturer who places into the stream of commerce a defective product which causes injury may be liable for such injury."). Under either theory of liability, a plaintiff may allege that a product is defective on any one of the following grounds: (1) defect as a result of a manufacturing flaw, (2) defective warning, and (3) defective design. *McCarthy*, 119 F.3d at 154-55 (citations omitted); *Sage v. Fairchild-Swearingen Corp.*, 70 N.Y.2d 579, 585 (1987) ("[A] product may be defective because of a manufacturing flaw, design defect or because of the inadequacy or absence of warnings for the use of such product."). "A party injured as a result of a defective product may seek relief against the product manufacturer or others in the

---

[15] On January 14, 2022, the Court ordered the parties to submit supplemental briefing addressing, *inter alia*, the applicable state law that governs this dispute. Dkt. 111. On January 28, 2022, the parties reported their agreement that New York law applies. Dkt. 112 at 1 (citing *Am. Fuel Corp. v. Utah Energy Dev. Co., Inc.*, 122 F.3d 130, 134 (2d Cir. 1997) ("[W]here the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry.")).

distribution chain if the defect was a substantial factor in causing the injury." *Speller ex rel. Miller v. Sears, Roebuck & Co.*, 100 N.Y.2d 38, 41 (2003).

## C.     Strict Liability

### 1.     Manufacturing Defect

To prove a strict liability manufacturing defect, a plaintiff must show "that a specific product unit was defective as a result of 'some mishap in the manufacturing process itself, improper workmanship, or because defective materials were used in construction,' and that the defect was the cause of plaintiff's injury." *Colon ex rel. Molina*, 199 F. Supp. 2d at 85 (quoting *Caprara v. Chrysler Corp.*, 52 N.Y.2d 114, 129 (1981)); *Derienzo v. Trek Bicycle Corp.*, 376 F. Supp. 2d 537, 560 (S.D.N.Y. 2005) ("The crux of a strict liability manufacturing defect claim is the product's failure to perform as expected due to an error in the manufacturing process that results in a defect." (internal quotation marks omitted)).  It is well settled that a plaintiff may prove a manufacturing defect by circumstantial evidence and need not identify a specific product defect. *Speller ex rel. Miller*, 100 N.Y.2d at 41; *Jarvis v. Ford Motor Co.*, 283 F.3d 33, 44 (2d Cir. 2002) (recognizing "the settled principal of New York law that a plaintiff in a products liability action is not required to prove a specific defect when a defect may be inferred from proof that the product did not perform as intended by the manufacturer"); *Ramos v. Howard Indus., Inc.*, 10 N.Y.3d 218, 223 (2008) ("It is well settled that a products liability cause of action may be proven by circumstantial evidence, and thus, a plaintiff need not identify a specific product defect." (citations omitted)); *Brown v. Borruso*, 660 N.Y.S.2d 780, 781 (App. Div. 1997) ("To make out a prima facie case of strict products liability based upon a manufacturing defect, plaintiff may rely upon the circumstances of the accident and proof that the product did not perform as intended.").  In such a case, "a plaintiff must prove that the product did not perform as intended and exclude all other causes for the product's failure that are not attributable to defendants." *Speller ex rel. Miller*,

100 N.Y.2d at 41 (citations omitted).  Where a defendant raises alternative causes to avoid liability for a product's failure, a plaintiff "raise[s] 'a triable question of fact by offering competent evidence which, if credited by the jury, [i]s sufficient to rebut [the] defendant['s] alternative cause evidence.'" *Ramos*, 10 N.Y.4d at 224 (quoting *Speller ex rel. Miller*, 100 N.Y.2d at 43).

Defendants argue that the Steering Gear had no manufacturing defects because "[t]he subject steering gear complied with all ZF ASE internal specifications and requirements and DTNA specifications and requirements," and "Plaintiff cannot show the steering gear deviated from DTNA's and ZF ASE's manufacturing requirements."  SJ Motion at 3-4.  In opposition, Plaintiff argues that questions of fact on his manufacturing defect claim preclude summary judgment because Plaintiff testified that the Steering Gear failed prior to the crash and "[t]he defect in the gear did not come from an intervening source."[16]  Dkt. 101 at 20-23.  Defendants argue in their reply that Plaintiff failed to meet his initial burden because Plaintiff "made no attempt to exclude other causes of the accident or the worm screw separation."  Dkt. 108 at 2-3.  Defendants further argue that, even if Plaintiff has met his initial burden, his manufacturing defect claim fails because after Defendants proposed an alternative explanation for the Crash, Plaintiff was required to come forward with some direct proof of the cause of the accident to maintain his claim for manufacturing defect.  *Id.* at 3-4  The Court disagrees with Defendants.

---

[16] Plaintiff also argues that "the gear had exceeded the life definition established by defendants['] specifications, and that the pre-crash failure was a foreseeable consequence of fatigue-related structural degradation." Dkt. 101 at 20; *see also id.* at 22 ("The only alteration the gear underwent was a consequence of the foreseeable structural degradation it experienced incidental to the operation of the truck.").  The Court does not understand how these arguments are relevant to whether the Steering Gear had a manufacturing defect.  In fact, these arguments appear to cut against Plaintiff's manufacturing defect claim because they would seem to suggest that the Steering Gear fractured due to "foreseeable structural degradation" from "exceed[ing] the life definition," and not from any defects in the product that "existed at the time of manufacture." *Id.* at 20, 22.  The Court, however, need not decide this issue on summary judgment.

As to Defendants' first argument, the Court finds that Plaintiff has met his initial burden. Plaintiff testified during his deposition that moments before the Crash, he "hear[d] something in the steering wheel" and then "could not turn any more" because his "steering wheel wasn't working at all." Bocoum Dep. Tr. at 106:20-107:23. The Truck's GPS data from the date of the Crash indicated that the Truck was measured traveling at a speed of 32.93 miles per hour approximately ten minutes before the Crash. Durisek Report at 9. McElroy also testified that he "looked at the wheels," "looked at the rims," and "looked at the undercarriage," and saw "no significant trauma" that would be consistent with the forces required to fracture the Steering Gear. McElroy Dep. Tr. at 67:8-17. All of this evidence, viewed in the light most favorable to Plaintiff, suggests that the Crash may not have been caused by "inattentiveness, weight shift, or excessive speed," as Defendants suggest, Dkt. 108 at 3, but by defects in the Steering Gear.

Turning to Defendants' argument that Plaintiff was required to present direct proof of the cause of the accident after Defendants proposed an alternative explanation for the Crash, Defendants misstate applicable New York law. As stated above, it is well settled that a plaintiff may prove a manufacturing defect by circumstantial evidence. *Speller ex rel. Miller*, 100 N.Y.2d at 41. In *Speller ex rel. Miller*, the New York Court of Appeals addressed and rejected the same argument that Defendants now assert:

> Defendants contend that after they came forward with evidence suggesting an alternative cause of the fire, plaintiffs were foreclosed from establishing a product defect circumstantially but were then required to produce evidence of a specific defect to survive summary judgment. We reject this approach for two reasons. First, such an analysis would allow a defendant who offered minimally sufficient alternative cause evidence in a products liability case to foreclose a plaintiff from proceeding circumstantially without a jury having determined whether defendant's evidence should be credited. Second, it misinterprets the court's role in adjudicating a motion for summary judgment, which is issue identification, not issue resolution. Where causation is disputed, summary judgment is not appropriate unless only one conclusion may be drawn from the established facts.

*Id.* at 44 (internal quotation marks omitted).

Accordingly, while a jury may ultimately find in Defendants' favor on Plaintiff's manufacturing defect claim at trial, viewing the evidence in the light most favorable to Plaintiff, material questions of fact preclude summary judgment.

### 2. Warning Defect

To state a claim for failure to warn under New York law, a plaintiff must show "(1) that a manufacturer has a duty to warn; (2) against dangers resulting from foreseeable uses about which it knew or should have known; and (3) that the failure to do so was the proximate cause of harm." *Colon ex rel. Molina*, 199 F. Supp. 2d at 84; *Oden v. Boston Sci. Corp.*, 330 F. Supp. 3d 877, 891 (E.D.N.Y. 2018) ("Pursuant to New York law, a plaintiff may assert that a product is defective because the manufacturer failed to provide adequate warnings regarding the risks and dangers associated with the use, or foreseeable misuse, of its product." (internal quotation marks omitted)). "This duty is a continuous one, and requires that the manufacturer be aware of the current information concerning the safety of its product." *Krasnopolsky v. Warner-Lambert Co.*, 799 F. Supp. 1342, 1345-46 (E.D.N.Y. 1992). "Liability for failure to warn may be imposed based upon either the complete failure to warn of a particular hazard or the inclusion of warnings that are insufficient." *Fisher v. Multiquip, Inc.*, 949 N.Y.S.2d 214, 218 (App. Div. 2012) (internal quotation marks omitted). Because "[f]ailure to warn is typically a fact-intensive inquiry for the jury to decide," "a court must deny a failure to warn claim as a matter of law where only one conclusion can be drawn from the established facts." *Colon ex rel. Molina*, 199 F. Supp. 2d at 85; *see also Liriano v. Hobart Corp.*, 92 N.Y.2d 232, 243 (1998) ("Failure-to-warn liability is intensely fact-specific, including but not limited to such issues as feasibility and difficulty of issuing warnings in the circumstances; obviousness of the risk from actual use of the product; knowledge of the particular product user; and proximate cause."); *Johnson v. Johnson Chem. Co., Inc.*, 588 N.Y.S.2d 607, 610 (App. Div. 1992) ("Whether a particular way of misusing a product

is reasonably foreseeable, and whether the warnings which accompany a product are adequate to deter such potential misuse, are ordinarily questions for the jury.").

Defendants do not dispute that they owed Plaintiff a duty to provide warnings regarding any risks and dangers associated with the operation of the Truck and the Steering Gear. Defendants also do not dispute that they did not provide any warning regarding the "life definition" of the Steering Gear or required maintenance or inspection at certain mileage intervals. Instead, Defendants argue that summary judgment on Plaintiff's warning defect claim is appropriate because Plaintiff cannot prove that the Steering Gear had pre-Crash fractures and Plaintiff's experts, McElroy and Grate, only offer "mere possibilities" of how the Steering Gear may have fractured prior to the Crash. SJ Motion at 5-6. Defendants argue that summary judgment is appropriate for the additional reason that Defendants' failure to warn was not a proximate cause of his injuries. *Id.* at 6-8.

As to Defendants' first point, issues of fact preclude summary judgment. Foremost, Plaintiff testified during his deposition that he "hear[d] something on the steering wheel" prior to the Crash and subsequent to hearing the sound, his "steering wheel wasn't working at all" and he "could not turn any more." Bocoum Dep. Tr. at 106:20-107:23. Additionally, while Plaintiff's experts did opine on possible causes for the fracture of the Steering Gear prior to the Crash, they proffered other opinions that go beyond a showing of "mere possibilities." For example, McElroy opined in his report that the "[p]hysical damage observed to the front tires, wheels, and suspension as a result of the [Crash] is not consistent with the forces required to fracture a known good worm gear in the steering box." McElroy Report at 2. He also testified during his deposition that he "looked at the wheels," "looked at the rims," and "looked at the undercarriage," and saw "no significant trauma" to the Truck from the Crash. McElroy Dep. Tr. at 67:8-17. Viewing the

evidence in the light most favorable to Plaintiff as the nonmoving party, questions of fact remain as to whether the Steering Gear had pre-Crash fractures.

As to Defendants' proximate cause argument, here too, questions of fact preclude summary judgment.  As an initial matter, Defendants are correct that Plaintiff's proposed warning that would require a magnetic particle inspection at one million miles would not have made a difference because, even viewing the evidence in the light most favorable to Plaintiff, it is unlikely that the Truck would have had over one million miles on the odometer at the time of the Crash.  Plaintiff's travel log from four days prior to the Crash reported an "Ending Odometer Reading" of 978,985 miles.  In order to have reached one million miles at the time of the Crash, Plaintiff would have had to travel on average a little over 5,253 miles per day over the four days leading up to the Crash (or approximately 219 miles per hour, driving nonstop for four days).  But as Plaintiff points out in his opposition, DTNA's specifications for the Steering Gear indicate that the Steering Gear had a "life definition" between "750,000 miles or 10 years (for Pick-Up & Delivery trucks) and 1.2 million miles or 10 years (for trucks used exclusively for Long Haul)."  Dkt. 101 at 9 (citing Steering Gear Specification at 8).  According to Plaintiff, DNTA's specifications "were a private communication between defendants intended for their internal use in designing and manufacturing the gear."  *Id.* at 11.  Thus, there remain questions of fact as to whether Defendants' failure to include a warning regarding the life definition of the Steering Gear proximately caused Plaintiff's injuries.

In their reply, Defendants argue that DTNA's specifications are irrelevant to Plaintiff's warning claim because Plaintiff's theory of liability is predicated on some pre-Crash damage to the Steering Gear caused by some prior event at some unknown time.  The Court is not persuaded.  As DTNA's representative testified during his deposition, although "the life target is not . . . an expiration date," it does set "a minimum expectation" and "vehicles exceeding the life target would

be expected to start to incur increased maintenance and repair costs at that time." Rieflin Dep. Tr. at 66:14-20. This testimony is consistent with Plaintiff's proposed theory that the Steering Gear was damaged prior to the Crash which could have been detected had Defendants provided warning that inspection or increased maintenance of the Steering Gear is necessary or recommended at certain mileage intervals. As such, viewing the evidence in the light most favorable to Plaintiff, a jury could reasonably find that Defendants' failure to include a warning in their manuals or maintenance guides regarding the life definition of the Steering Gear proximately caused Plaintiff's injuries.[17]

Lastly, Defendants argue that their failure to warn did not proximately cause Plaintiff's injuries because "there is no evidence plaintiff or his employer, Pionna, would have read and heeded DTNA's or ZF ASE's instructions." SJ Motion at 7-8; *see also* Dkt. 108 at 8-9 (reply brief). Defendants point to deposition testimony by Plaintiff and Pionna's representatives that they never open the steering box because "[t]here is nothing to inspect" since "everything is inside the box," Gonzalez Dep. Tr. at 38:14-25, and that neither Plaintiff nor Pionna received or reviewed any of Defendants' maintenance or service manuals prior to the Crash, *id.* at 70:17-20; Salazar Dep. Tr. at 98:13-99:22; Bocoum Dep. Tr. at 202:17-203:17. "While the chain of proximate causation may be broken when a plaintiff does not show that another warning would have made a difference, failure to read a manufacturer's warning, without more, is insufficient to defeat a failure to warn claim on summary judgment." *Figueroa v. Boston Sci. Corp.*, 254 F. Supp. 2d 361, 370

---

[17] Defendants also argue that "no witness in this case previously labeled the truck as a 'pick up & delivery' vehicle or substantively mentioned the 750,000-mile target" and that the Truck "was a long-haul vehicle subject to the 1.2-million-mile target." Dkt. 108 at 8. At best, the sources cited by Defendants support a finding that Plaintiff operated the Truck as a long-haul vehicle. They do not, however, explain the nature of the operation of the Truck during the approximately seven-year period prior to Pionna's purchase of the Truck.

(S.D.N.Y. 2003) (citation omitted); *see also Lumbermens Mut. Cas. Co. v. Banco Espanol de Credito, S.A.*, No. 03 Civ. 5819 (KMW) (MHD), 2006 WL 2987694, at *6 n.20 (S.D.N.Y. Oct. 13, 2006) ("[I]n a products liability case, a defendant may not avoid liability on a failure to warn claim 'solely on the basis that the plaintiff failed to read the warning which were issued.'" (quoting *Johnson*, 588 N.Y.S.2d at 611)); *Ramirez v. Komori Am. Corp.*, No. 94 Civ. 3083 (DAB), 1999 WL 187072, at *7 (S.D.N.Y. Apr. 6, 1999) ("A plaintiff's admission that he or she did not read such warnings that were provided on the product, need not necessarily sever the causal connection between the alleged failure to warn and the accident, where a trier of fact could still find that the plaintiff would have heeded a more prominent or urgent warning." (citation omitted)).

Moreover, unlike the decisions on which Defendants rely where there was lack of *any* evidence that the plaintiff had read the defendant's manual prior to his injuries, here, there is some evidence that Pionna's mechanics had read Defendants' manuals.  Salazar, Pionna's safety manager, testified that the company has "access to the DTNA website which has to do with . . . service guidelines" and "repair guidelines," and that Pionna's "mechanic has a computer that . . . [is] loaded with the diagnostic software of Freightliner, so any updates on that" would get "forward[ed] to the mechanic."  Salazar Dep. Tr. at 99:24-100:8.  And although Salazar testified that he was not sure whether Pionna had access to Defendants' maintenance guidelines, his testimony, at a minimum, raises a triable issue of fact as to whether Pionna could have read the warning at a time when the warning, if adequate, might have been efficacious.

Accordingly, Defendants' motion for summary judgment on Plaintiff's warning defect claim is denied.

### D.    Other Claims

Defendants also move for summary judgment on Plaintiff's negligence-based claims, design defect claims, and breach of warranty claims.  *See* SJ Motion at 3-4, 8.  To the extent the

Amended Complaint alleges claims under a negligence theory, design defect claims, or warranty claims, Plaintiff fails to address these claims in his opposition to Defendants' motion for summary judgment and, therefore, such claims are deemed abandoned.  *See Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 143 (2d Cir. 2016) ("[W]hen a counseled party moves for summary judgment, 'a partial response [by the non-movant] arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims.'" (quoting *Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014)); *Hardy v. City of New York*, 732 F. Supp. 2d 112, 125 (E.D.N.Y. 2010) ("Federal courts have the discretion to deem a claim abandoned 'when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.'" (citation omitted)); *Dineen ex rel. Dineen v. Stramka*, 228 F. Supp. 2d 447, 454 (S.D.N.Y. 2002) (noting that the plaintiff's failure to address the defendant's claims in opposition to summary judgment "enabl[es] the Court to conclude that [the plaintiff] has abandoned them" (citation omitted)).

As to Plaintiff's claims based on negligence, Plaintiff's abandonment is demonstrated not only by his failure to address these claims in his opposition to Defendants' motion for summary judgment and the parties' *Daubert* motions, but also by his repeated representations to this Court and Defendants that "[t]his is an action to hold the [Defendants] accountable in strict products liability due to the failure of the steering gear, the failure to warn and/or provide proper instructions regarding the steering gear manufactured by ZF and used by DTNA in its vehicles, including the subject vehicle in this matter, and breach of implied warranty."  Dkt. 101 at 1; *see also* Dkts. 84-85, 87-90, 96-99, 106-107, 109.  Likewise, Plaintiff in his motion to exclude the testimony of

Defendants' expert Noah expressly disclaimed any design defect claim.  Dkt. 90 at 7 ("Since there is no design claim, the opinion is irrelevant, unnecessary, and will not assist the trier of facts.").[18]

As to Plaintiff's breach of warranty claims, Plaintiff includes the legal standard for breach of implied warranty, *see* Dkt. 101 at 8, but fails to offer any arguments in opposition to Defendants' motion for summary judgment on the warranty claims.  In any event, the Court agrees with Defendants that any breach of warranty claims are time-barred under New York law.  Under section 2-725 of New York's Uniform Commercial Code, the statute of limitations for breach of warranty claims is four years from the date that a defendant tenders delivery of the product.  N.Y. U.C.C. § 2-725(1) ("An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued."); *id.* § 2-725(2) ("A breach of warranty occurs when tender of delivery is made."); *Vanata v. Delta Int'l Mach. Corp.*, 702 N.Y.S.2d 293, 295 (App. Div. 2000) ("[U]nder UCC § 2-725, an action for breach of implied warranty must be commenced within four years from the date that the defendant tenders delivery of the product." (citation omitted)).  The four-year statute of limitations thus begins to run "upon delivery of the product to the initial purchaser." *Lara v. Delta Int'l Mach. Corp.*, 174 F. Supp. 3d 719, 745 (E.D.N.Y. 2016); *see also Hu v. Tishman Speyer Silverstein P'ship*, No. 97 Civ. 2356 (KTD), 2000 WL 1277336, at

---

[18] Confusingly, Plaintiff argues in his Rule 56.1 Counterstatement that "the circumstantial evidence, including Plaintiff Bocoum's testimony (Exh. 41) regarding the loss of steering function just prior to the crash, and the notice to DTNA (Exh. 43), establishes a *prima facie* claim of Strict Products Liability for a manufacturing defect, *design defect*, and/or failure to warn claim."  Pl. Counter 56.1 Stmt. ¶ 7 (emphasis added).  The Court need not consider Plaintiff's legal argument in his Rule 56.1 Counterstatement. *See Jessamy v. City of New Rochelle, N.Y.*, 292 F. Supp. 2d 498, 509 n.12 (S.D.N.Y. 2003) (no heed given to legal conclusions in Rule 56.1 statement); *Taveras v. HRV Mgmt., Inc.*, No. 17 Civ. 5211 (SJB), 2020 WL 1501777, at *2 (E.D.N.Y. Mar. 24, 2020) ("Legal arguments are impermissible in any Rule 56.1 Statement and are to be disregarded.").  Moreover, as noted, because Plaintiff failed to respond to Defendants' design defect arguments in his opposition to Defendants' motion for summary judgment, such claim, if any, is deemed abandoned.

*4 (S.D.N.Y. Sept. 8, 2000) ("[A] cause of action against a manufacturer or distributor accrues on the date the party charged tenders delivery of the product, not on the date that some third party sells it to [the] plaintiff." (citation omitted)).  Such accrual is deemed to have occurred "regardless of the aggrieved party's lack of knowledge of the breach," N.Y. U.C.C. § 2-725(2), and even where the suit is brought by a party who is not in privity with the manufacturer, *Heller v. U.S. Suzuki Motor Corp.*, 64 N.Y.2d 407, 411 (1985).  An exception to this general rule applies "where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance." N.Y. U.C.C. § 2-725(2).  In such a case, "the cause of action accrues when the breach is or should have been discovered." *Id.*

Here, Defendants contend that "[t]he subject vehicle was tendered for delivery to the original purchaser on or about February 22, 2006, and ZF ASE tendered delivery of the steering gear to its customer prior to February 22, 2006." SJ Motion at 9; Pl. Counter 56.1 Stmt. ¶¶ 1, 3; McDaniel Cert., Exh. 1.  Therefore, the latest that Plaintiff could have brought his breach of warranty claims was on or about February 22, 2010—over five years prior to the Crash and seven years prior to Plaintiff's commencement of this action.  Plaintiff admits these facts, *see* Pl. Counter 56.1 Stmt. ¶¶ 1, 3, and does not present any arguments to suggest that his warranty claims are still timely or that an exception to the four-year statute of limitations applies in this case.  Accordingly, Plaintiff's breach of warranty claims are dismissed for abandonment and as time-barred.

## IV.    Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is granted in part and denied in part, and Plaintiff's claims for negligence, design defect, and breach of warranty are dismissed with prejudice.  Furthermore, Defendants' motion to exclude the testimony of Frank Grate is granted in part and denied in part, Defendants' motion to exclude the testimony of Robert McElroy is granted in part and denied in part, Plaintiff's motion to exclude the testimony of

Nicholas Durisek is denied, Plaintiff's motion to exclude the testimony of Timothy Cheek is granted in part and denied in part, and Plaintiff's motion to exclude the testimony of Bruce Noah is granted in part and denied in part.  The parties' requests for oral argument on their respective motions, Dkts. 77, 79, are denied as moot.

Within seven days of the date of this Opinion and Order, the parties shall submit a joint letter addressing whether referral to the Court-annexed mediation program or to the Honorable Barbara C. Moses, United States Magistrate Judge, for another settlement conference would be beneficial.  If the parties do not wish to be referred to mediation or for another settlement conference, they should include in their joint letter proposed trial ready dates for the third and fourth quarters of 2022.  Furthermore, within thirty days from the date of this Opinion and Order, the parties shall submit a joint proposed pretrial order and the other pretrial filings required under Rule 7.B of the Court's Individual Rules and Practices in Civil Cases.

The Clerk of Court is respectfully directed to terminate the motions pending at Docket Numbers 77, 79, 84, 85, and 87.  The Clerk of Court also is respectfully directed to amend the caption of this action to replace "TRW Automotive U.S. LLC" with "ZF Active Safety and Electronics US LLC, *formerly known as* TRW Automotive U.S. LLC" as a Defendant in this action.

SO ORDERED.

Dated: March 28, 2022
      New York, New York

JOHN P. CRONAN
United States District Judge